**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Sten THORDARSON, Martin Fry, Craig Dunbar, Martin Salgado, and Charles Wise, Defendants-Appellees.**

**No. 80–1239.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 17, 1980.

Decided May 20, 1981.

Rehearing and Rehearing En Banc Denied Aug. 5, 1981.

---

Charles C. Wehner, Sp. Atty., Los Angeles, Cal., for plaintiff-appellant.

Jan Lawrence Handzlik, Stilz, Boyd, Levine & Handzlik, Los Angeles, Cal., for defendants-appellees.

Before PREGERSON, FERGUSON and NORRIS, Circuit Judges.

NORRIS, Circuit Judge:

The government appeals from a district court order dismissing a ten-count indict-

ment charging defendants with violating 18 U.S.C. §§ 1962(d), 1952, and 844(i), and 29 U.S.C. § 501(c). This court has jurisdiction under 18 U.S.C. § 3731. We reverse.

## I. *Facts*

In 1978, the employees of the Redman Moving and Storage Company of Thousand Oaks, California, elected Teamsters Local 186 as their bargaining agent. When Redman refused to recognize the union, Local 186, aided by Teamsters, Local 389, called a strike against the company. During the time of the strike, Redman trucks in California, Arizona and Connecticut were damaged or destroyed.

In November of 1979, a ten-count indictment was filed in the United States District Court for the Central District of California, alleging that the defendants—all officers or employees of Local 186 or Local 389—conspired to destroy Redman trucks in an effort to coerce Redman into recognizing the Teamsters.

The indictment charges defendants with the use of explosives to damage vehicles used in interstate commerce in violation of 18 U.S.C. § 844(i)[1] (Counts 2 and 3); travel in interstate commerce to commit arson in violation of the Travel Act, 18 U.S.C. § 1952[2] (Counts 4 and 5); conversion of union funds in violation of 29 U.S.C. § 501(c)[3] (Counts 6 through 10); and conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1962(d)[4] (Count 1).[5] The alleged pattern of racketeering includ-

**1.** 18 U.S.C. § 844(i) provides that:

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall. be imprisoned . . . or fined . . . or both.

**2.** 18 U.S.C. § 1952 provides in pertinent part that:

(a) Whoever travels in interstate or foreign commerce, or uses any facility in interstate or foreign commerce, including the mail, with intent to . . . (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined . . . or imprisoned . . . or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

**3.** Section 501(c) provides that:

(c) Any person who embezzles or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined . . . or imprisoned . . . or both.

**4.** Section 1962(d) provides:

It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
Section 1962(c) provides:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .
An "enterprise" as defined by § 1961(4) includes:
any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.
A "pattern of racketeering activity" as defined by § 1961(5):
requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.
"Racketeering activity" as defined by § 1961(1) includes:
(A) any act or threat, involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment

**5.** See note 5 on page 1326.

ed the conduct charged substantively in Counts 2 through 10.

The district court dismissed all ten counts of the indictment. The RICO, Travel Act and explosives charges (Counts 1–5) were dismissed on the authority of *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), which the district court read as "preclud[ing] federal prosecution for violent activity which occurs during the course of a legitimate labor dispute" absent specific authorization from Congress. *United States v. Thordarson,* 487 F.Supp. 991, 995 (C.D.Cal.1980). The conversion of union funds charges were dismissed for failure to allege essential elements of the offense.

## II. *Counts 1 through 5:* United States v. Enmons

In *Enmons,* the defendants were striking union members charged with using violence to obtain higher wages and other employment benefits in violation of the Hobbs Act, 18 U.S.C. § 1951. The issue was whether acts of violence committed during a lawful strike for the purpose of inducing an employer's agreement to legitimate collective bargaining demands constituted extortion, defined by the Hobbs Act as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear." 18 U.S.C. § 1951(b)(2).[6]

In interpreting the statute, Justice Stewart, writing for the majority, focused on the word "wrongful," and reasoned that be-

cause it would be redundant to speak of "wrongful violence" or "wrongful force," Congress must have intended "wrongful" to limit the statute's coverage "to those instances where the obtaining of the property would itself be 'wrongful' because the extortionist has no lawful claim to the property." 410 U.S. at 400, 93 S.Ct. at 1009–1010. Accordingly, the Court held that violence to achieve legitimate union objectives is not within the Hobbs Act's prohibition because there is no "wrongful" taking of the employer's property when union members receive wages and benefits in exchange for genuine services bargained for by the employer.

The Court found support in the legislative history of the Hobbs Act for its interpretation of "extortion". The predecessor of the Act, § 2 of the Anti-Racketeering Act of 1934, 48 Stat. 979, proscribed the exaction of valuable consideration by force, violence or coercion, but expressly excepted "the payment of wages by a bona-fide employer to a bona-fide employee." In enacting the Hobbs Act, Congress eliminated this express wage exception in response to the Supreme Court's decision in *United States v. Local 807,* 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942). In that case, the Court had held that the wage exception immunized from prosecution under the Anti-Racketeering Act New York City truck drivers who "by violence and threats exacted payments for themselves from out-of-town truckers in return for the unwanted and superfluous service of driving out-of-

for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... Section 1952 (relating to racketeering) .... and (C) any act which is indictable under title 29, United States Code, ... section 501(c) (*relating to embezzlement from union funds*).

**5.** All defendants are charged with violating the Travel Act, RICO and 28 U.S.C. § 501(c). Only defendants Fry and Salgado are named in the explosives counts.

**6.** 18 U.S.C. § 1951 provides in pertinent part:
(a) Whoever in any way or degree obstructs, delays, or affects commerce or the

movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined ... or imprisoned ... or both.
(b) As used in this section—
(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

town trucks to and from the city." *Enmons*, 410 U.S. at 402, 93 S.Ct. at 1010. The *Enmons* Court, however, despite Congress' repeal of the express wage exception in enacting the Hobbs Act, read the legislative history as evidencing an intent to preserve an exemption for violence in pursuit of legitimate collective bargaining objectives. *Id.* at 404–07, 93 S.Ct. at 1012–1013. In particular, the Court pointed to assurances given during the floor debate that the Hobbs Act would not interfere with legitimate labor activity and that a simple assault during a strike would not become a federal crime under the Act. *Id.*[7]

The Court noted that the broad interpretation of extortion advanced by the government would reach "all overtly coercive conduct in the course of an economic strike . . . [with the result that] [t]he worker who threw a punch on a picket line or the striker who deflated the tires on his employer's truck would be subject to a Hobbs Act prosecution and the possibility of twenty years' imprisonment and a $10,000 fine." *Id.* at 410, 93 S.Ct. at 1015. In rejecting this reading of the statute, the Court concluded:

> [I]t would require statutory language much more explicit than that before us here to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes. Neither the language of the Hobbs Act nor its legislative history can justify the conclusion that Congress intended to work such an extraordinary change in federal labor law or such an unprecedented incursion into the criminal jurisdiction of the States.

*Id.* at 411, 93 S.Ct. at 1015.

The defendants contend that the effect of *Enmons* is to place violence during the course of legitimate strike activity beyond the reach of all federal criminal laws. We cannot agree. There is no basis in the Court's decision or its underlying rationale for the creation of an "*Enmons* doctrine" of immunity applicable to all federal criminal statutes.[8] We read *Enmons* as holding only that the use of violence to secure legitimate collective bargaining objectives is beyond the reach of the Hobbs Act.

■ The Court's holding in *Enmons* turned on its reading of the specific language of § 1951—particularly the term "wrongful" in the definition of extortion—and its reading of the Hobbs Act's singular legislative history. By contrast, the defendants have not cited, and we have not found, anything in the statutory language or the legislative history of the Travel Act, RICO or § 844 of Title 18 which indicates that Congress intended to exclude from the reach of those statutes violence in the pursuit of legitimate union objectives. Indeed, our reading of those statutes suggests that Congress intended no such exemption.[9]

The Travel Act, on its face, applies to "[w]hoever travels in interstate . . . com-

---

**7.** Justice Douglas, writing for the four dissenters in *Enmons*, contended that by repealing the wage exception in the Anti-Racketeering Act and by rejecting similar amendments, Congress intended to include within the ambit of the Hobbs Act the use of threats and violence to achieve legitimate, as well as illegitimate, labor objectives. 410 U.S. at 413–19, 93 S.Ct. at 1016–1019.

**8.** We are unaware of any other case in which a criminal defendant has attempted to assert *United States v. Enmons* as a defense to a prosecution under a statute other than the Hobbs Act. *Cf. United States v. Parker*, 586 F.2d 422 (5th Cir. 1978), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979) (affirming without discussion of *Enmons* a conviction under § 844(i) on facts virtually identical

to the case *sub judice*); *United States v. Love*, 482 F.2d 213 (5th Cir.), *cert. denied*, 414 U.S. 1026, 94 S.Ct. 453, 38 L.Ed.2d 318 (1973) (same); *Langel v. United States*, 451 F.2d 957 (8th Cir. 1971) (affirming without discussion of *Enmons* a conviction of union members for possessing a prohibited firearm—a bomb—in violation of 26 U.S.C. § 5861(d) in connection with the destruction of an employer's truck during a bona fide labor dispute).

**9.** The Travel Act includes within its definition of unlawful activity "extortion . . . in violation of the laws of the State in which committed or of the United States." 18 U.S.C. § 1952(b)(2). Extortion chargeable under state law is also included in the definition of "racketeering activity" provided by RICO. In light of the emphasis in *Enmons* on the special characteristics

merce or uses any facility in interstate commerce ... with intent to ... promote, manage, establish, carry on ... arson in violation of the laws of the State in which committed or of the United States." 18 U.S.C. § 1952. Section 844(i) of Title 18 covers "[w]hoever maliciously damages or destroys, or attempts to damage or destroy, by means of explosive, any ... vehicle ... used in interstate commerce ... or in any activity affecting interstate ... commerce." RICO provides that it shall be unlawful to conspire "to conduct or participate ... in the conduct [of an] enterprise's affairs through a pattern of racketeering activity ...." 18 U.S.C. § 1962(c), (d).

Racketeering activity includes "any act or threat involving ... arson ... which is chargeable under state law and punishable by imprisonment for more than one year; ... any act which is indictable under title 18, United States Code ... Section 1952 ... [and] any act which is indictable under Title 29, United States Code, ... Section 501(c)." 18 U.S.C. § 1961(1).

These statutes are written in general terms and make criminal the prescribed conduct without regard to the status or ultimate objectives of the person engaging in it.[10] *See, e. g., United States v. Roselli,* 432 F.2d 879, 885 (9th Cir. 1970), *cert. de-*

---

of the crime of extortion, *see* discussion *infra,* its holding delimiting the scope of the Hobbs Act arguably should be extended to similarly limit the scope of the RICO and Travel Act extortion provisions. That issue, however, is not before us at this time.

**10.** Thus, while the Travel Act was primarily directed at suppressing the unlawful local activities that provide organized crime with its source of funds, *see Legislation Relating to Organized Crime: Hearings on H. R. 468, H. R. 1246, etc., before Subcommittee No. 5 of the House Committee on the Judiciary,* 87th Cong., 1st Sess. (1961); *The Attorney General's Program to Curb Organized Crime and Racketeering: Hearings on S. 1653, S. 1654, etc., before the Senate Committee on the Judiciary,* 87th Cong., 1st Sess. (1961), its reach is not limited to the activities of organized crime. *See, e. g., United States v. Roselli,* 432 F.2d 879, 884–85 (9th Cir. 1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). Rather, the Act forbids persons from traveling interstate or using the facilities of interstate commerce to commit any of the offenses enumerated in § 1952(b). *See United States v. Nardello,* 393 U.S. 286, 293, 89 S.Ct. 534, 538, 21 L.Ed.2d 487 (1969). As this court observed in *United States v. Roselli, supra,* in rejecting the defendants' argument that their scheme to cheat at gin rummy was not within the reach of § 1952(b)(1),

> The words of Section 1952 are general; they contain no restriction to particular persons or to particular kinds of gambling, liquor, narcotics and prostitution offenses .... [A]s we read the legislative record, Congress meant exactly what the language of Section 1952 states—it deliberately chose to make the statute applicable generally, and without crippling restrictions, to any person engaged in any kind of illicit business enterprise in one of the four fields of activity specified in

the statute, which experience showed to be those in which organized racketeers commonly engaged.

*Id.* at 885.

*See also United States v. Barnes,* 383 F.2d 287, 289 n.2 (6th Cir. 1967), *cert. denied,* 389 U.S. 1040, 88 S.Ct. 780, 19 L.Ed.2d 831 (1968); *United States v. Vespe,* 389 F.Supp. 1359, 1368–69 (D.Del.), *aff'd sub nom. United States v. Shaffer,* 520 F.2d 1369 (3d Cir. 1975).

The district court's conclusion that RICO does not apply because the "defendants have not engaged in any activities which constitute 'labor racketeering'" must be rejected for similar reasons. Although never clearly articulated, the defendants' theory appears to be that since the primary purpose of RICO is to rid legitimate organizations of the influence of organized crime, and since the defendants' conduct was not alleged to be in aid of organized crime nor part of a "racketeering scheme" as that term is most commonly used, RICO does not reach the defendants' conduct.

This circuit has squarely held, however, that RICO does not require that the defendants be engaged in "organized crime." *United States v. Campanale,* 518 F.2d 352, 363 (9th Cir. 1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). *See also United States v. Grande,* 620 F.2d 1026, 1030 (4th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980); *United States v. Aleman,* 609 F.2d 298, 303–04 (7th Cir. 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Mandel,* 415 F.Supp. 997, 1018–20 (D.Md.1976); McCellan, *The Organized Crime Act (S. 30) or Its Critics: Which Threatens Civil Liberties?,* 46 Notre Dame Law. 55, 142–44 (1970). While Congress, in enacting RICO, focused on the type of activities commonly engaged in by organized crime, § 1962 of the Act was written to "make[s] unlawful such activities no matter who engages therein." *United States v. Campanale,* 518 F.2d at 363.

*nied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971) (Travel Act); *United States v. Perrin,* 580 F.2d 730, 733 (5th Cir. 1978), *aff'd,* 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) (Travel Act); *United States v. Campanale,* 518 F.2d 352, 363–64 (9th Cir. 1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976) (RICO); *United States v. Field,* 432 F.Supp. 55, 57–58 (S.D. N.Y.1977), *aff'd,* 578 F.2d 1371 (2d Cir. 1978) (RICO). We consider it improbable that Congress, having determined that arson and the willful misuse of explosives constituted a sufficiently grave threat to persons and property to warrant the imposition of federal criminal sanctions, intended to make the imposition of such sanctions depend upon whether the person who willfully causes the fire or explosion did so for his own personal gain or for the gain of members of his union.

Nor do we consider the policy arguments advanced in *Enmons* applicable to this case. In *Enmons,* the Court focused on the special characteristics of the crime of extortion which embraces *any* act or threat of violence, however, minor, used to obtain the property of another. The underlying concern was that to apply a federal extortion statute in the context of the collective bargaining process would transform minor acts of labor violence punishable by state law into federal felonies, thus placing the federal government in the business of policing the routine conduct of strike activity.

There is little, if any, risk that the crimes charged in this indictment, if applied to labor violence, would involve the federal government in policing routine strike activity. The destruction of vehicles used in interstate commerce by means of explosives and travel in interstate commerce to commit arson are hardly the sorts of minor picket line violence that the *Enmons* Court feared would be transformed into federal crimes under the Hobbs Act.

Moreover, there is no basis for the contention that the indictment in this case constitutes an unintended incursion into state criminal jurisdiction. Both RICO and the Travel Act explicitly prohibit conduct also chargeable under state laws of arson. 18 U.S.C. § 1961(1); 18 U.S.C. § 1952(b)(2). In addition, the legislative history of 18 U.S.C. § 844 clearly shows that it was enacted in response to the perceived "absence of any effective state or local controls" over explosives. H.R.Rep.No.91–1549, 91st Cong. 2d Sess., *reprinted in* [1970] U.S.Code

Nor did Congress intend to remove from the coverage of the Act behavior that would otherwise constitute "racketeering activity," as defined in § 1961(1), solely because it was not engaged in for personal profit. *See, e. g., United States v. Field,* 432 F.Supp. 55, 57–58 (S.D. N.Y.1977), *aff'd,* 578 F.2d 1371 (2d Cir. 1978).

Moreover, to create an exception for conduct that is not part of a "racketeering scheme," as that term may be commonly used, would create substantial uncertainty in the law and raise significant questions as to the constitutionality of the Act. In *United States v. Culbert,* 435 U.S. 371, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978), for example, the defendant argued that proof of "racketeering" was an element of a Hobbs Act violation. While acknowledging that the Hobbs Act was aimed primarily at racketeering activities, the Court rejected the defendant's argument, emphasizing that the Act was written in broad language and the legislative history revealed no intention to limit the statutory language. In addition, the Court noted that due process requires that a statute define the elements of a crime with sufficient clarity that "persons of common intelligence [will not] nec-essarily guess as to its meaning and differ as to its application." *Id.* at 374, 98 S.Ct. at 1114, *quoting Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Thus, the Court cautioned that serious due process problems would be raised if a general undefined term like "racketeering" was read into the statute. *Id.* 435 U.S. at 374, 98 S.Ct. at 1114.

Like the Second Circuit, we are not unmindful that "the potentially broad reach of RICO poses a danger of abuse where the prosecutor attempts to apply the statute to situations for which it was not primarily intended." *United States v. Weisman,* 624 F.2d 1118, 1123 (2d Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980), *quoting United States v. Huber,* 603 F.2d 387, 395–96 (2d Cir. 1979). We, too, "caution against undue prosecutorial zeal in invoking RICO." *Id.* The defendants in this case, however, would have us substitute their own definition of racketeering for the one provided by § 1961 of the Act. This we cannot do.

Cong. & Ad.News at 4007, 4013. *See also United States v. Dawson,* 467 F.2d 668, 671–73 (8th Cir. 1971), *cert. denied,* 410 U.S. 956, 93 S.Ct. 1427, 35 L.Ed.2d 689 (1972). Thus, to the extent that this indictment, by reaching conduct also punishable under state law, represents an incursion into state criminal jurisdiction, it was an incursion plainly and deliberately undertaken by Congress.[11]

To uphold the dismissal of Counts 1 through 5, we would be required to create an exemption for labor violence that would necessarily be applicable to all federal criminal statutes. As counsel for the defendants candidly admitted during oral argument, if an *"Enmons* doctrine" were to immunize a union official from federal prosecution under the Travel Act or § 844(i), it would, in all logic, immunize from federal prosecution a union official—or, indeed, an employer—desperate enough to resort to

kidnapping to achieve collective bargaining objectives. To carve out a narrow exemption from a federal extortion statute on the basis of its language and legislative history, as the Supreme Court did in *Enmons,* is one thing; to exempt a wide range of violent behavior from all federal criminal liability, despite plain language that prohibits such conduct, is quite another.[12]

■ The defendants nevertheless contend that the federal regulation of labor union activities through a comprehensive scheme of predominantly civil remedies evidences a Congressional intent to exempt labor violence from federal criminal prosecution. This argument is without merit. The federal labor laws do not purport to govern all unlawful conduct engaged in by union members and officials. Thus, while acts of violence directed at an employer during a strike may be found, in some circumstances, to restrain or coerce employees in the exer-

---

**11.** The district court quotes *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), for the proposition that an "expansive interpretation of the Travel Act would alter sensitive federal-state relationships, [and] could over-extend federal police resources . . . ." In *Rewis,* the Court held that conducting a gambling establishment frequented by out-of-state bettors does not, without more, violate the Travel Act. In the recent case of *Perrin v. United States,* 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979), however, the Court ˙rejected a claim that the concerns for federalism expressed in *Rewis* require a narrow interpretation of the Travel Act. The issue in *Perrin* was whether the Travel Act proscribed commercial bribery that violated state law. In holding that it did, the Court noted that

> So long as the requisite interstate nexus is present, the statute reflects a clear and deliberate intent on the part of Congress to alter the federal-state balance in order to reinforce state law enforcement. In defining an "unlawful activity," Congress has clearly stated its intention to include violations of state as well as federal bribery law. Until statutes such as the Travel Act contravene some provision of the Constitution, the choice is for Congress, not the courts.

*Id.* 100 S.Ct. at 318.

**12.** The district court below cited a number of circuit court decisions in support of an across-the-board exemption derived from *Enmons.* We find these cases inapposite. *United States*

*v. Quinn,* 514 F.2d 1250 (5th Cir. 1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976), affirmed a conviction under the Hobbs Act for receiving payoffs from an employer in return for calling off a picket line at the employer's store. The court noted that although a bona fide labor dispute existed and the defendant was authorized to represent the employees, the payment was received in violation of § 302 of the Taft-Hartley Act and therefore could not be in pursuit of *legitimate* labor objectives. There was no discussion in *Quinn* of the applicability of *Enmons* to any federal statute other than the Hobbs Act.

*United States v. Cerilli,* 603 F.2d 415 (3d Cir. 1979), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980), affirmed a conviction under the Hobbs Act for extorting political contributions. The court noted that the *Enmons* decision was the result of the unique legislative history of the Hobbs Act and must be applied cautiously outside the labor context. *Id.* at 419–20. There is nothing in the Third Circuit's opinion to suggest that *Enmons* creates a general exemption from federal criminal law for violence in furtherance of legitimate labor goals. Similarly, the other cases cited by the district court provide no support for its holding that "absent specific authorization from Congress, *United States v. Enmons* precludes federal criminal prosecution for violent activity which occurs during the course of a legitimate labor dispute." *Thordarson,* 487 F.Supp. at 995.

cise of their rights guaranteed under § 7 of the National Labor Relations Act, *see e. g., NLRB v. Union Nacional de Trabajadores,* 540 F.2d 1 (1st Cir. 1976), *cert. denied,* 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); *NLRB v. United Mines Workers,* 429 F.2d 141, 147–48 (3rd Cir. 1970), they are not in and of themselves unfair labor practices. *Cf. Linn v. Plant Guard Workers,* 383 U.S. 53, 63, 86 S.Ct. 657, 663, 15 L.Ed.2d 582 (1966) (defamation arising during a labor dispute is not an unfair labor practice absent showing that it interfered with exercise of specific rights guaranteed under the National Labor Relations Act). Moreover, even to the extent that the federal labor laws do reach union violence to achieve collective bargaining objectives, it is clear that they do not provide the exclusive remedy for such violence. *See Linn v. Plant Guard Workers, supra; Auto Workers v. Wisconsin Board,* 351 U.S. 266, 272–73, 76 S.Ct. 794, 798–799, 100 L.Ed. 1162 (1956). Defendants concede, for example, that arson and the destruction of property by means of explosives may be prosecuted under state criminal laws whether or not those acts also constitute unfair labor practices.[13] Nothing in the language or legislative history of federal labor legislation suggests that federal criminal statutes—enacted to supplement state criminal sanctions—should not similarly be available to punish union members and officials who try to achieve collective bargaining goals by means of the kind of violence charged in the indictment before us.

The defendants' reliance on *United States v. DeLaurentis,* 491 F.2d 208 (2d Cir. 1974), is also misplaced. In *DeLaurentis,* the federal government invoked an 1870 civil rights statute to prosecute union officials for threatening and intimidating union members in violation of § 7 of the National Labor Relations Act, which gives an employee the right to refrain from engaging in concerted union activities. In reversing the conviction, the Second Circuit held that Congress did not intend § 7 violations to be enforced under the 1870 Civil Rights Act, 18 U.S.C. § 241,[14] but rather intended such violations to be enforced by the procedures and sanctions provided by the National Labor Relations Act. In this case, the undisputed availability of state criminal law demonstrates that the procedures and civil sanctions set forth in the National Labor Relations Act were not intended to be the exclusive means of regulating violence to achieve collective bargaining objectives. Moreover, in contrast to the broad language of the 1870 Civil Rights Act prohibiting persons from conspiring to "injure, oppress, threaten or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured him by the . . . laws of the United States," the language of the statutes involved in this appeal plainly and specifically reaches the acts of violence alleged in the indictment.

We therefore reverse the dismissal of Counts 1 through 5 of the indictment.

### III. *Counts 6 through 10: the § 501(c) Violations*

The government also appeals from the district court's dismissal of Counts 6 through 10 of the indictment which charge the defendant with using union funds to destroy Redman trucks in violation of § 501(c) of the Landrum-Griffith Act, 29 U.S.C. § 501(c). Section 501(c) prohibits a

---

13. State tort law may also be available to award compensation for damages resulting from violent conduct during the course of a strike. *See Automobile Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958); *San Diego Unions v. Garmon,* 359 U.S. 236, 247–49, 79 S.Ct. 773, 780–782, 3 L.Ed.2d 775 (1959).

14. Section 241 provides in pertinent part:

If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same . . . . they shall be fined not more than $10,000 or imprisoned not more than 10 years.

union officer or employee from converting union funds to his own use or the use of another.[15]

The district court dismissed Counts 6 through 10, apparently for failure to allege essential elements of the offense. *See United States v. Thordarson,* 487 F.Supp. 991, 995–99 (C.D.Cal.1980). The district court held that the essential elements of § 501(c) include (1) a fraudulent intent to deprive the union of its funds and (2) either a lack of union authorization or an absence of a good faith belief in benefit to the union. *Id.* at 996–97. Not finding these elements alleged in the indictment,[16] the district court dismissed. *Id.* at 998–99.

■ The government contends that the use of union funds for an illegal purpose constitutes a *per se* violation of § 501(c) under *United States v. Boyle,* 482 F.2d 755 (D.C.Cir.), *cert. denied,* 414 U.S. 1076, 94 S.Ct. 593, 38 L.Ed.2d 483 (1973). This court, like the court below, declines to follow *Boyle* and the *per se* rule it espouses. We nevertheless conclude that the district court erred in dismissing the indictment for failure to allege the essential elements of a § 501(c) offense. We hold that neither a lack of union authorization nor an absence of good faith belief in union benefit need be alleged in an indictment as essential elements of § 501(c), and that the indictment in this case adequately alleged fraudulent intent. We reverse, therefore, the district court's dismissal of Counts 6 through 10.

### A. *United States v. Boyle*

The defendant in *Boyle* was convicted of violating § 501(c) by using union funds to make campaign contributions. The contributions were illegal under 18 U.S.C. § 610 (repealed Pub.L. No. 94–283, Title II, § 201(a), 90 Stat. 496 (1976)) which prohibited labor unions from contributing money to candidates for federal office. On appeal, the defendant challenged his conviction on two grounds. First, he contended that to convict under § 501(c) the jury must find either that the expenditure was made without union authorization or that the union derived no benefit from the expenditure. Second, he argued that § 501(c) was intended to punish only *knowingly* illegal or *ultra vires* expenditures. The Court of Appeals for the District of Columbia rejected both contentions.

The D.C. Circuit noted that "[n]o officer or union governing body could in all logic believe that a transfer for a criminal purpose was for a legitimate union purpose, was authorized by the union constitution or by-laws, or was for the union's benefit." *United States v. Boyle,* 482 F.2d at 765. Nor was there any "hint in either the statute or its legislative history that indicates a Congressional intent to excuse from the ambit of § 501(c) transfers for a criminal purpose." *Id.* The Court thus concluded "[i]f the use to which the money is knowingly transferred is unlawful, then the transfer constitutes a violation of § 501(c)." *Id.* at 764.

In this case, the union funds were allegedly used for the purpose of financing the destruction of Redman trucks. The government argues that since the expenditure was for an unlawful purpose the indictment is sufficient to state a § 501(c) offense under the *Boyle* decision. We, how-

---

**15.** For the text of § 501(c), *see* footnote 3, *supra.*

**16.** In considering whether the indictment alleged these elements, the district court found that "[i]t is unlikely that there was a fraudulent intent to deprive the union of its funds"; that the expenditures were authorized under the unions' constitutions; that there was concededly "no evidence that union funds were used for the defendants' personal benefit"; and, follow-

ing *Enmons,* that violent and illegal means used to achieve for legitimate union ends "are for the union's benefit." *United States v. Thordarson,* 487 F.Supp. 991, 998 (C.D.Cal.1980).

At issue at this stage of the litigation, of course, is the sufficiency of the indictment, not *the sufficiency of the government's evidence.* For example, the government contends that under the international union's constitution, the expenditures were not authorized.

ever, like the district court, find *Boyle* unpersuasive.[17]

Section 501(c) states a "larceny-type" offense. *United States v. Marolda*, 615 F.2d 867, 872–73 (9th Cir. 1980) (Judge Larson, concurring); *United States v. Silverman*, 430 F.2d 106, 126–27 (2d Cir.), *modified on other grounds*, 439 F.2d 1198 (1970), *cert. denied*, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971). Although the scope of criminal liability under § 501(c) extends beyond the common law offense of larceny and the old statutory crime of embezzlement, the essence of the § 501(c) crime, like the older crimes of embezzlement and larceny is the "tak[ing] [of] another's property . . . knowing that the other person would not have wanted that to be done." *United States v. Silverman*, 430 F.2d at 126–27; *United States v. Andreen*, 628 F.2d 1236 at 1241. Thus, it is well established that proof of a specific criminal intent to deprive the union of its funds is required to make out a § 501(c) violation.

The *Boyle* court, however, would in effect irrebuttably presume the requisite criminal intent where union funds are used for a criminal purpose. The effect of such an approach would be to impermissibly convert a "larceny-type" statute requiring a fraudulent intent to deprive the union of its funds into a statute subjecting individual officers and employees to criminal liability for union expenditures made for prohibited purposes.[18] In addition, such an interpretation would permit a conviction under § 501(c) without a finding by the trier of fact that the defendant has "taken another person's property . . . knowing that the other person would not have wanted that to be done." *United States v. Silverman*, 430 F.2d at 126–27. We conclude that such an approach improperly presumes an essential element of a § 501(c) offense. Accordingly, we decline to follow *Boyle*.

**17.** Although the district court found the *Boyle* decision "troubling", it sought to distinguish *Boyle* on its facts. *Boyle*, the district court found, involved an expenditure of union funds which was prohibited by criminal statute. In the present case, the specific *expenditure*—the reimbursement for expenses—was not prohibited by statute, only the eventual *use* of the money to destroy trucks was illegal, and so the district court held that *Boyle* did not apply. *Thordarson*, 487 F.Supp. at 997–98. We, however, find *Boyle* indistinguishable from the present case on its facts. The § 501(c) violation in *Boyle* involved a transfer from the United Mine Workers' (UMW) treasury to the UMW's legislative and lobbying arm. While the transfer was to facilitate the making of unlawful contributions, the transfer itself was not unlawful. *See id.* at 758–59 and n.8.

**18.** The holding in *Boyle* converts § 501(c) from a "larceny-type" statute to a statute criminalizing union expenditures for certain purposes. Such a reading would make criminal certain breaches of fiduciary duty despite the absence of a specific intent to deprive the union of its funds. We find no support in the legislative history for such a reading of the statute.

First, the precursors to §§ 501(a) and 501(c) were added to the Act at different times. These precursors are first found in S. 1555, 86th Cong., 1st Sess. (1959). Section 109(a) of S. 1555, as reported from the Committee on Labor and Public Welfare on April 14, 1959, is almost identical to § 501(c). *See* 105 Cong.Rec.

5980 (1959). There was no federal fiduciary obligation in the bill at that time. *See* S.Rep.No. 187, 86th Cong., 1st Sess. (1959), *reprinted in* [1959] U.S. Code Cong. & Ad. News, 2318, 2376–77 (Minority views). A fiduciary obligation was added to the bill by an amendment proposed by Senator McClellan, 105 Cong.Rec. 6525, on April 23, 1959, as § 509, and later renumbered § 609. 105 Cong.Rec. 6523–28 (1959). The subsequent House Bill, H.R. 8342, included § 109(a) of S. 1555 almost verbatim as § 501(c), but strengthened the fiduciary obligation by replacing § 609 of S. 1555 with § 501(a). *See* 105 Cong.Rec. 15549–50 (1959) (remarks of Rep. Bolling); *Id.* at 15888 (text of H.R. 8342).

Second, the legislative history states that § 501(b), and not § 501(c), was meant to be the enforcement provision for § 501(a). The discussion of fiduciary duties in the analysis of H.R. 8342 discusses § 501(b) as the enforcement provision for § 501(a) and fails to mention § 501(c). *See* H.R.Rep.No. 741, 86th Cong., 1st Sess. (1959) *reprinted in* [1959] U.S. Code Cong. & Ad. News 2424, 2479–80 (Supplementary views). The Senate Republicans' remarks on the conference bill, reported by Senator Goldwater, state that the purpose of § 501(c) is to make embezzlement and other thefts of union funds federal crimes as well as state crimes, while the purpose of § 501(b) is to enforce the fiduciary duty of union officials. *See* 105 Cong. Rec. 19766 (1959) (remarks of Sen. Goldwater).

## B. *The Essential Elements of § 501(c)*

Since it is not disputed that fraudulent intent is an element of § 501(c), we must consider whether lack of authorization and lack of good faith belief in union benefit are also elements of § 501(c). In two recent cases this circuit addressed this issue without totally resolving it. *United States v. Andreen*, 628 F.2d 1236, 1242 (9th Cir. 1980); *United States v. Marolda*, 615 F.2d 867, 869–70 (9th Cir. 1980).

In *Marolda*, the defendant was convicted of violating § 501(c) after the court's instructions to the jury failed to mention lack of authorization or lack of union benefit. The court reversed the conviction because of a prejudicial variance between the jury instructions and the language of the indictment, which had explicitly alleged both lack of authorization and lack of union benefit. *Id.* at 870. Thus the court was not required to reach the issue whether either or both are essential elements of § 501(c). Judge Larson, however, in a well-reasoned concurring opinion, addressed the issue and concluded that neither lack of authorization nor lack of union benefit is an essential element. *Id.* at 872. Rather, he wrote, both bear on the issue of criminal intent.

In *Andreen*, the court held that if the government established lack of authorization, it need not prove lack of union benefit.[19] 628 F.2d at 1242–43. The court expressly left open the issue now before us—whether the government must allege and prove lack of union benefit if it fails to establish lack of authorization—although in dictum it approved the position taken by Judge Larson in his concurring opinion in

*Marolda*. *Andreen*, 628 F.2d at 1242. We also agree with Judge Larson and now hold that neither lack of authorization nor lack of good faith belief in union benefit is an essential element of § 501(c). Neither, therefore, need be alleged in the indictment, even though we recognize that evidence of either or both is likely to be admissible at trial as bearing on the issue of criminal intent to convert union funds to the defendant's own use or the use of another.

Section 501(c) is one of a number of statutes in which Congress has extended federal jurisdiction to cover common law theft crimes. As noted by Judge Friendly in *United States v. Silverman*, 430 F.2d at 126, the language of § 501(c) resembles the language of such "larceny-type" statutes as 18 U.S.C. §§ 641, 645, 655–61.[20] In determining the elements of § 501(c), we are strongly influenced by the doctrine of these other "larceny-type" statutes.

Judge Larson, in his concurrence in *Marolda*, suggests that Congress, in enacting § 501(c), "was merely transmuting common law theft crimes involving union funds and committed by union officers or employees into Federal crimes." 615 F.2d at 872. The Supreme Court has stated in dictum that 18 U.S.C. § 641 was intended to combine the common law theft crimes and also outlaw acts which might fall into the "gaps or crevices" separating those crimes. *Morissette v. United States*, 342 U.S. 246, 271, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952). As we read the legislative history of § 501(c), Congress' intent in passing it was the same as with § 641.[21] We see no evidence that Congress, in enacting § 501(c), intended to

---

**19.** The issue on appeal in *Andreen* was the sufficiency of the evidence for a conviction under 18 U.S.C. § 664. The court treated the case as though it were a § 501(c) conviction because § 664, which relates to employee welfare and pension plans, uses language that parallels § 501(c).

**20.** The key language in 29 U.S.C. § 501(c) is "embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or to the use of another." The comparable language in

18 U.S.C. § 641 is "embezzles, steals, purloins, or knowingly converts to his use or the use of another"; the language in 18 U.S.C. § 656 and § 657 is "embezzles, abstracts, purloins, or wilfully misapplies."

**21.** The Senate Minority Report on S. 1555 states that § 109(a), the precursor to § 501(c), does nothing more than make the state crimes of embezzlement and theft federal crimes for union officials, and does not give union members any additional protection. S.Rep.No. 187,

add any new elements to the common law theft offenses except those necessary to show federal jurisdiction and subject matter: that the accused is (1) an official or employee (2) of a labor organization (3) involved in interstate commerce, and that (4) the funds belong to the labor organization. *United States v. Bane*, 583 F.2d 832, 836 n.9 (6th Cir. 1978), *cert. denied*, 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979) (identifying the jurisdictional elements of § 501(c)); *Silverman*, 430 F.2d at 111 (same). Instead, as stated in *Morissette, supra,* Congress intended to simplify some of the technical requirements of the common law crimes.

■ We therefore see no reason to add lack of authorization or lack of good faith

belief in union benefit to the list of essential elements of § 501(c). Neither of the two has a counterpart in the elements of the common law theft crimes or of the other federal theft statutes.[22] "Congress subjected union officers or employees to the same test of criminal liability as government employees, bank officers and the like—not to a lower one." *Silverman*, 430 F.2d at 127. The two elements which the government must allege and prove, in addition to jurisdictional elements, in making out a § 501(c) violation, are the same as those announced by the Supreme Court for § 641: fraudulent intent and conversion to the defendant's own use or the use of another. *Morissette*, 342 U.S. at 271–72, 72 S.Ct. at 254.[23] *See also United States v. Durnin*, 632 F.2d 1297, 1300 (5th Cir. 1980).[24]

86th Cong., 1st Sess. (1959), *reprinted in* U.S. Code Cong. & Ad. News 2318, 2401 (Minority views, Appendix B). Senator Goldwater, commenting on this section, renumbered 209(a), stated that it merely created "concurrent jurisdiction" and was "like gilding the lily." 105 Cong.Rec. 10099 (remarks of Sen. Goldwater). We have found nothing in the legislative history to contradict these remarks. *See also* note 18 *supra.*

**22.** The elements of embezzlement, when codified in a statute such as 18 U.S.C. § 641, are:

(1) a trust or fiduciary relationship, (2) that the property claimed embezzled is embraced within the meaning of the statute, (3) that it came into the possession or care of accused by virtue of his employment, (4) it is property of another, (5) that his dealing therewith constituted a fraudulent conversion or appropriation of same to his own use, and (6) such was with the intent to deprive the owner thereof.

*United States v. Powell*, 294 F.Supp. 1353, 1355 (E.D.Va.1968), *aff'd*, 413 F.2d 1037 (4th Cir. 1969).

The elements of common law larceny are (1) a wrongful taking and carrying away (asportation), (2) of the personal property of another, (3) with the fraudulent intent to deprive the owner of his property without his consent. *United States v. Barlow*, 470 F.2d 1245, 1251 (D.C. Cir. 1972); *see also Morissette v. United States*, 342 U.S. 246, 267 n.28, 72 S.Ct. 240, 251–253 n.28, 96 L.Ed. 288 (1952). Larceny is usually incorporated in a federal theft statute in a broadened form by means of the words "steal" or "purloin": "Stealing, having no common law definition to restrict its meaning as an offense, is commonly used to denote any dishonest transaction whereby one person obtains that which rightfully belongs to another, and

deprives the owner of the rights and benefits of ownership, but may or may not involve the element of stealth usually attributed to the word *purloin.*" *Morissette*, 342 U.S. at 268 n.28, 72 S.Ct. at 251–253 n.28, *quoting Crabb v. Zerbst*, 99 F.2d 562, 565 (5th Cir. 1938). Conversion is even broader than stealing, since it can be accomplished without a wrongful taking (where the converter's initial possession was lawful) and without any intent to keep possession, so long as the property is misused or abused. *Morissette*, 342 U.S. at 271–72, 72 S.Ct. at 254.

Thus the addition of elements of lack of authorization or lack of union benefit is directly counter to the thrust of the federal theft statutes to eliminate the technicalities of the common law offenses. *See generally Id.* at 263–73, 72 S.Ct. at 249–255.

**23.** Although *Morissette* does not explicitly state that conversion is an element of § 641, that is the effect of *Morissette*'s reasoning. *Morissette* states that "[p]robably every stealing is a conversion," 342 U.S. at 271, 72 S.Ct. at 254, and then shows that a stealing is a conversion with the added elements of a wrongful taking and an intent to retain possession. *Id.* at 272, 72 S.Ct. at 254. Embezzlement and purloining, the other two offenses combined to make § 641, are also conversions with other elements added: to purloin is to steal with the element of stealth, *id.* at 268 n.28, 72 S.Ct. at 251–253 n.28, and conversion is an established element of embezzlement. *See, e. g., United States v. Powell, supra*, 294 F.Supp. at 1355. It is thus clear from *Morissette* that any violation of § 641 must involve a conversion.

**24.** We recognize that there appears to be considerable support in other circuits for the de-

We do think that lack of authorization, lack of union benefit, and the defendant's failure to believe that there is authorization or union benefit, all are likely to bear on the essential element of fraudulent intent. *See Andreen*, 628 F.2d at 1242–43; *Marolda*, 615 F.2d at 873 (Larson, J., concurring). In a particular case, these factors may be crucial in determining the defendant's intent. In such a case, a jury instruction concerning them is likely to be appropriate.

For example, in this case, appellants are free to argue that they had no criminal

intent because they believed that blowing up trucks conferred a benefit on the union and that the union, were it able to speak, would have wanted its money spent for such an unlawful purpose. The government can argue the contrary and in so doing is free to introduce evidence that destroying the trucks was unauthorized and did not work to the benefit of the union members as a whole. The trier of fact will then have to determine whether the government has proved its case that the defendants have " 'taken another person's property . . . knowing that the other person

---

fendant's position that there are additional essential elements to § 501(c)—although we note that those circuits fail to agree on what the *additional elements are.* The Sixth Circuit has adopted the view that § 501(c) does not require a showing of lack of authorization or lack of union benefit, but does require a showing of fraudulent intent and a lack of good faith belief in authorization and union benefit. *United States v. Bane*, 583 F.2d 832 (6th Cir. 1978), *cert. denied*, 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979). The Fifth Circuit has held that the elements of § 501(c) include fraudulent intent and either actual lack of authorization or lack of a good faith belief in union benefit. *United States v. Dixon*, 609 F.2d 827 (5th Cir. 1980); *see also United States v. Nell*, 526 F.2d 1223 (5th Cir. 1976) (fraudulent intent and lack of authorization sufficient). *But see United States v. Durnin*, 632 F.2d 1297, 1300 & n.5 (5th Cir. 1980) (suggesting that authorization is irrelevant if fraudulent intent is "thoroughly established"). The Eighth Circuit agrees that *fraudulent intent and lack of authorization are* sufficient, but has reserved the issue as to what elements in addition to fraudulent intent are required if the expenditure is authorized. *United States v. Goad*, 490 F.2d 1158 (8th Cir.), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974). Finally, the Second Circuit has held that the elements of § 501(c) are fraudulent intent and either lack of authorization (or ratification) or lack of good faith belief in union benefit. *United States v. Santiago*, 528 F.2d 1130, 1133–34 (2nd Cir.), *cert. denied*, 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976). *But see United States v. Silverman*, 430 F.2d 106, 117–18, 126–27 (2nd Cir.), *modified on other grounds*, 439 F.2d 1198 (1970), *cert. denied*, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971) (Judge Moore suggests lack of actual union benefit, and not a lack of belief in union benefit, is required if authorization is present; Judges Friendly and Hays agree *arguendo* ).

Like Judge Larson, we are "not certain why courts began to add new elements to § 501(c) crimes," *Marolda*, 615 F.2d at 873, but we suspect that the procedural posture of each case has had an effect. Ours appears to be the first case involving a government appeal from the dismissal of the indictment for failure to allege essential elements of the offense. Preceding § 501(c) cases have involved post-conviction appeals when issues relating to lack of authorization or lack of union benefit turned on the circumstances of the particular case, such as the jury instruction, or the evidence actually adduced at trial. *See, e. g., United States v. Dixon*, 609 F.2d 827 (5th Cir. 1980); *United States v. Nell*, 526 F.2d 1223 (5th Cir. 1976); *United States v. Ottley*, 509 F.2d 667 (2d Cir. 1975); *United States v. Bane, supra; United States v. Goad*, 490 F.2d 1158 (8th Cir.), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974).

For example, *United States v. Silverman, supra*, considered as the seminal case on the question of the elements of § 501(c), *see, e. g., Goad, supra*, and *Ottley, supra*, involved challenges both to the indictment and to the sufficiency of the evidence. The indictment in *Silverman*, like the indictment in the present case, merely tracked the language of § 501(c) and then gave the dates and amounts involved in the transaction underlying each count of the indictment. *Silverman*, 430 F.2d at 109–110. Neither lack of authorization nor lack of union benefit was specifically alleged. The indictment, challenged on other grounds, was upheld. Judge Friendly, however, writing for the *majority, held that the evidence concerning an* expenditure of union funds for a local political campaign was insufficient to sustain a § 501(c) conviction where the union had authorized the expenditure and the expenditure benefited the union. *Silverman*, 430 F.2d at 126–28. The discussion of authorization is confined strictly to the issue of the sufficiency of the evidence.

would not have wanted that to be done,' " *Andreen*, 628 F.2d at 1241, *quoting Silverman*, 430 F.2d at 126–27, and that "the 'union' presumably would have objected if it had been able to speak freely." *Silverman*, 430 F.2d at 127.

In conclusion, we hold that the indictment need merely allege fraudulent intent, and need not allege lack of authorization nor lack of belief in union benefit.

## C. The Sufficiency of the Indictment

The district court in this case apparently held that the indictment was insufficient not only because it failed to set forth either lack of authorization or lack of good faith belief in union benefit, but also because it failed to adequately allege fraudulent intent. Upon review of the indictment, however, we find that fraudulent intent is adequately alleged.

Counts 6, 9, and 10 of the indictment allege that the defendants "did embezzle, steal, and unlawfully and wilfully abstract and convert to their own use and the use of another" the funds of the union. Counts 7 and 8 of the indictment allege that the defendants "did embezzle, steal and unlaw-

fully convert to their own use and the use of another" the funds of the union. Language just like that in Counts 6, 9 and 10 has been held to constitute a sufficient allegation of criminal intent under § 501(c). *See Colella v. United States*, 360 F.2d 792, 798–99 (1st Cir.), *cert. denied*, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966); *Doyle v. United States*, 318 F.2d 419, 420–22 (8th Cir. 1963). The word "wilfully," read in the context of the statutory language used in the indictment as a whole, is sufficient to allege the requisite criminal intent. *See United States v. Illinois Central Railroad Co.*, 303 U.S. 239, 242, 58 S.Ct. 533, 534–535, 82 L.Ed. 773 (1938) ("In statutes denouncing offenses involving turpitude, 'wilfully' is generally used to mean with evil purpose, criminal intent or the like").[25] The language in Counts 7 and 8, though less complete, adequately informs the defendants of the charges against which they must defend. *See Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974).

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

PREGERSON, Circuit Judge (concurring and dissenting):

Because section 501(c) of the Landrum-Griffin Act is expressly designed to regu-

---

**25.** The district court, in discussing the fraudulent intent issue, stated that "[i]t is unlikely that there was a fraudulent intent to deprive the union of its funds because reimbursement for the expenses incurred in labor organizing, and particularly strike-oriented activities, are probably not for acts 'that the union would not have wanted ... done.' " *United States v. Thordarson, supra*, 487 F.Supp. at 998. This suggests that the district court may have dismissed the indictment not because the indictment failed to allege fraudulent intent, but because the court doubted that fraudulent intent could be proved at trial. If this was the district court's reasoning, it was in error. An indictment is sufficient if it adequately alleges the elements of the offense and fairly informs the defendant. *See Hamling v. United States, supra*, 418 U.S. at 117, 94 S.Ct. at 2907 *and United States v. Bailey*, 444 U.S. 394 at 414, 100 S.Ct. 624 at 636, 62 L.Ed.2d 575. The strength of the government's case is not at issue. However difficult it may be to prove fraudulent intent on the facts of this case, the

government is entitled to an opportunity to present its proof.

The government admitted at oral argument that unless this circuit follows the rule in *United States v. Boyle, supra* (fraudulent intent is presumed where the union funds are spent for an unlawful purpose), the government has little hope of establishing criminal intent in this case. We have declined to follow *Boyle*. We do not, however, interpret the government's statement as a concession that we can appropriately reverse the district court only if we decide to follow *Boyle*. The government's underlying contention is that the indictment sufficiently alleged all of the elements of § 501(c). We hold that the indictment is indeed sufficient. If the government concludes that it does not have adequate proof of fraudulent intent without use of the *Boyle* doctrine, it is free to use its prosecutorial discretion not to proceed on the § 501(c) counts.

late the conduct of union officials in the use of union funds, I agree that the district court erred in dismissing those counts of the indictment that charged violations of section 501(c), and join in Parts I and III of the court's opinion. I cannot agree, however, with the majority's view of the scope of *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). I believe that the rationale animating *Enmons* precludes the application of RICO, the Travel Act, or 18 U.S.C. § 844(i) to violence incidental to a legitimate labor dispute. Accordingly, I dissent from Part II of the majority's opinion.

The majority distinguishes *Enmons* from the case at bar by reading it as based on the specific language and legislative history of the Hobbs Act. I agree with the district court, however, that "it is inaccurate to so narrowly limit the case." *United States v. Thordarson*, 487 F.Supp. 991, 992–93 (D.C.C. D.Cal.1980). The Court in *Enmons* explicitly stated that even had the language and history of the Hobbs Act not precluded its application to violence during legitimate labor disputes, policy reasons would make such application improper. 410 U.S. at 411, 93 S.Ct. at 1015. The Court voiced its reluctance, absent unmistakably compelling statutory language, to conclude "that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes." Id. This policy is as appropriate here as in *Enmons* and counsels against extending RICO, the Travel Act, or section 844(i) to "the use of force to achieve legitimate collective-bargaining demands." 410 U.S. at 408, 93 S.Ct. at 1014.

The majority neglects this policy consideration. The only policy argument stated

in *Enmons* that the majority acknowledges is that "the special characteristics of the crime of extortion" made the Court fear that applying the Hobbs Act to labor disputes risked transforming minor picket line violence into federal crimes. The majority scarcely recognizes that applying the Travel Act or RICO to labor disputes creates the same risk, since extortion is one of the "unlawful activities" to which the Travel Act applies and is included in RICO's definition of "racketeering activity." [1]

More serious, however, is the majority's failure to appreciate that the *Enmons* decision rests not solely on the interpretation of the particular statute involved there, but on a broad, historically justified concern that the federal government not intrude into the business of policing the orderly conduct of legitimate labor disputes. Punishing lawlessness perpetrated during labor disputes has historically been and should continue to be the province of the States and their law enforcement authorities. I therefore respectfully dissent from Part II of the court's opinion.

---

1. The Travel Act penalizes anyone who travels in interstate commerce with intent to carry on an "unlawful activity" and does thereafter carry on such activity. 18 U.S.C. § 1952(a)(3). And it includes extortion in its definition of "unlawful activity." 18 U.S.C. § 1952(b). RICO prohibits "racketeering activity" in various contexts, 18 U.S.C. § 1962, and extortion chargeable under state law is explicitly included in the definition of such activity. 18 U.S.C. § 1961(1)(A).

The majority does acknowledge this problem but suggests that *Enmons* "arguably should be extended to ... limit the scope of the RICO and Travel Act extortion provisions." Majority Opinion, note 9. This concession makes it clear that *Enmons* cannot be read as based solely on the legislative history of the Hobbs Act.