**MHC, INC. and Samoyed Energy Company, Inc., Plaintiffs,**

v.

**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, et al., Defendants/Third Party Plaintiffs,**

v.

**MHC, INC., Samoyed Energy Company, Inc., et al., Third Party Defendants.**

**Civ. A. No. 85–296.**

United States District Court, E.D. Kentucky, at Pikeville.

March 2, 1988.

Forrest H. Roles, Anna M. Norton, Smith, Heenan & Althen, Charleston, W.Va., William I. Althen, Smith, Heenan & Althen, Washington, D.C., Donald H. Combs, Combs & Combs, PSC, Pikeville, Ky., Shelby C. Kinkead, Jr., Bulleit, Kinkead, Irvin & Reinhardt, Lexington, Ky., for plaintiffs.

Sherry Brashear, Goss, Chappel & Brashear, Harlan, Ky., for Donald Tackett.

Earl Brown, Washington, D.C., Michael J. Passino, Jane P. North, Nashville, Tenn., Michael Holland, United Mine Workers of America, Washington, D.C., for Intern. Union, UMWA, Local 2496, UMWA.

James R. Hampton, Hazard, Ky., for Intern. UMWA, Local 2496, James Scott and Donnie Thornsbury.

Bernard Pafunda, Pikeville, Ky., for Dist. 30, UMWA, Ernie Justice.

Eugene Goss, Mark David Goss, Goss, Chappel & Brashear, Harlan, Ky., for Local 2496, UMWA.

Marcia Milby Ridings, Hamm, Milby & Ridings, London, Ky., W. David Kiser, Ackerson, Ackerson, Blandford & Kiser, Louis-ville, Ky., for third party defendant Storm Sec. Systems, Inc.

John A. West, Patrick A. Nepute, Greenebaum, Doll & McDonald, Lexington, Ky., Richard S. Cleary, Janet P. Jakubowicz, Greenebaum, Doll & McDonald, Louisville, Ky., for third party defendants Ashland Coal, Inc. and P.C. Holding, Inc.

Forrest H. Roles, Mark A. Carter, Smith, Heenan & Althen, Charleston, W.Va., Donald H. Combs, Pikeville, Ky., for third party defendants, Charles Carlton, William J. Higginbotham Clifford Ed Marenko, William Joseph Gwinn Keith Andrew Elkins.

Grover C. Potts, Jr., Wyatt, Tarrant & Combs, Louisville, Ky., George J. Miller, Wyatt, Tarrant & Combs, Lexington, Ky., for Sharondale Corp.

## MEMORANDUM OPINION AND ORDER

WILHOIT, District Judge.

This matter is presently before the Court on numerous motions for dismissal or, in the alternative for summary judgment. The plaintiffs, two coal companies, have instituted this action pursuant to 18 U.S.C. § 1964(c), the so-called civil RICO action, alleging a conspiracy to deprive them of property rights through illegal picketing and acts of violence constituting felonies and that such activities affected interstate commerce. The defendants, by counter-claim and a third party complaint, also assert a § 1964(c) claim and certain pendant state claims alleging that there was a conspiracy to deprive the union members of their contract rights and several predicate acts of violence of the same nature as those alleged in the plaintiffs' claim.

### FACTS

In December of 1980, Brinco, Ltd. (BRINCO), a Canadian corporation, acting through its wholly owned U.S. subsidiary, Sharondale Corporation (SHARONDALE), purchased the mining assets of the Loftis Coal Company, including the mineral properties, coal preparation plant, and mining equipment (hereinafter the "LOFTIS MINE"). At the time of the purchase, the

LOFTIS MINE employed 86 non-union miners; by 1982, the mine work force had grown to approximately 150.

After an election in 1982, the United Mine Workers of America (UMW) was certified by the National Labor Relations Board (NLRB) as the collective bargaining agent at the LOFTIS MINE. In October of 1982, SHARONDALE signed the 1981 National Bituminous Coal Wage Agreement (NBCWA) with the UMW.

SHARONDALE shut down the LOFTIS MINE in October of 1983 and laid off the work force. Prior to the shut down, SHARONDALE supposedly informed the miners that if certain production targets were met, the LOFTIS MINE would remain in operation. It is alleged that the production targets were met by the miners.

In November of 1984, more than a year after the LOFTIS MINE was shut down, SHARONDALE sold the mining assets, including the mineral properties, preparation plant, and mining equipment to M.H.C., Inc. (MHC). Thereafter, Samoyed Energy Company (SAMOYED) reopened the LOFTIS MINE as contract miner for MHC and commenced mining operations with its own non-union work force.

Following the commencement of mining operations by SAMOYED, the UMW engaged in various activities, including picketing, which were intended to persuade SAMOYED and MHC to recognize the UMW as the collective bargaining agent for the SAMOYED Miners at the LOFTIS MINE.

On April 4, 1985, the NLRB entered an Order finding that the UMW did not represent the employees of MHC or SAMOYED. The Sixth Circuit Court of Appeals entered a Judgment on May 5, 1985 enforcing the NLRB's April 4th determination that the UMW was not entitled to picket or cause the companies to be picketed where the object was to force or require the companies to recognize or bargain with the UMW as the collective bargaining representative of their employees.

Beginning with the date that the SAMOYED employees reported to work at the LOFTIS MINE and continuing until September of 1985 when an injunction was issued by the Pike County Circuit Court, members of the UMW manned picket shacks near the LOFTIS MINE. The picket facilities were surrounded by sandbags and had high curtains designed to conceal the identities of those present. The picket areas had the appearance of, and functioned as, a fort or bunker.

UMW members located at or near these picket shacks and persons acting in concert with them, on a regular and frequent basis, engaged in the following activities directed against MHC's and SAMOYED's property and employees, and those seeking to do business with them:

1. Carried, brandished, and discharged firearms and sling shots.

2. Threw rocks, bottles, and other objects.

3. Made threats and engaged in similar verbal behavior intended to intimidate employees.

4. Threw nails and spiked boards in front of coal trucks.

5. Threw "Molotov cocktails" destroying company property.

As a result of these activities, a number of company employees and contractors have been injured. One coal truck driver was killed and another wounded when their trucks were "ambushed."[1] In addition, one union member was wounded by gunfire from a passing vehicle while in the picket shack.

As a result of the activities on the part of UMW, SAMOYED was unable to haul coal except on a very limited basis and as a result the company ceased production and

---

**1.** In a criminal case before this Court in Ashland, Kentucky, a jury found four union members guilty of willfully disabling and damaging a motor vehicle engaged in interstate commerce with reckless disregard for the life of the driver. *United States v. Heightland,* 678 F.Supp. 159 (E.D.Ky.1987). These union members fired numerous rifle shots at two coal trucks owned by an independent contractor who hauled coal for SAMOYED. The alleged trigger-man with the shotgun that killed one driver and wounded another driver, was tried and acquitted in a separate trial at London, Kentucky.

coal haulage in July 1985 for a period of time.

The plaintiffs, MHC and SAMOYED, commenced this action alleging violations of Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 et seq. and the common law of tortious interference with business relations of the Commonwealth of Kentucky. The defendants have instituted a counterclaim and third party action also alleging violations of RICO contending that the coal companies fraudulently manipulated corporate form as to evade obligations imposed by collective bargaining agreements. It is also alleged that the third party and counterclaim defendants committed numerous acts of violence, including:

1. Arson—the burning of a building owned by the local union.

2. Kidnapping—restraint of union members at gunpoint while committing arson.

3. Assault with a deadly weapon—fired gunshots at union members on various occasions.

The matter is presently before the Court on numerous motions for dismissal or, in the alternative, for summary judgment. These parties contend that all of their actions were taken in connection with a labor dispute and that the jurisdiction of the Court is preempted by the NLRB. In the alternative, it is claimed that the RICO allegations are insufficient as a matter of law. Various other contentions include: (1) the action is barred by the statute of limitations; (2) that there are no cognizable damages alleged; (3) that the abuse of process claim is premature; and (4) that an individual's claim of violence is barred by KRS 413.140(1).

There is also a motion before the Court by the defendant/third party plaintiffs requesting a reconsideration of its motion to dismiss or, in the alternative, for summary judgment. It is claimed that this is a labor dispute over which the NLRB has jurisdiction and that the RICO claims are insufficient as a matter of law.

## DISCUSSION

### I. Preemption

The matter before the Court involves the knotty problem of the interrelationship of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 41 et seq., and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 et seq. It has been alleged that the present action merely involves unfair labor disputes within the parameters of 29 U.S.C. §§ 157 and 158 and, as such, the jurisdiction of the Court is preempted by the exclusive jurisdiction of the National Labor Relations Board (NLRB) to hear matters involving unfair labor claims.

This Court believes that this action involves more than just the mere resolution of unfair labor claims. This action presents the question as to whether a RICO action is preempted by the NLRA when the predicate acts alleged may also be classified as unfair labor practices.

"The constitutional principles of pre-emption, in whatever particular field of law they operate, are designed with a common end in view: to avoid conflicting regulation of conduct by various official bodies which might have some authority over the subject matter." *Amalgamated Association of Street, Electric Railway & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 285–86, 91 S.Ct. 1909, 1917–18, 29 L.Ed.2d 473 (1971). "A multiplicity of tribunals and a diversity of procedures are quite apt to produce incompatible or conflicting adjudications." *Garner v. Teamsters, Union No. 776*, 346 U.S. 485, 490–91, 74 S.Ct. 161, 166, 98 L.Ed. 228 (1953). The principle of preemption, as expressed in the NLRA, was born "to delimit state and federal judicial authority over labor disputes in order to preclude, so far as reasonably possible, conflict between the exertion of judicial and administrative power in the attainment of the multi-faceted policies underlying the federal scheme." *Lockridge*, 403 U.S. at 286, 91 S.Ct. at 1918.

The standard that has been adopted to determine whether or not a labor action should be preempted is the standard expressed in *San Diego Building Trades*

*Council v. Garmon,* 359 U.S. 236, 244–45, 79 S.Ct. 773, 779–80, 3 L.Ed.2d 775 (1959):

> When it is clear or may be fairly assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of the federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law.... When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference is to be averted.

■ Courts have determined that there are several instances in which preemption is not required. *Lockridge,* 403 U.S. at 297, 91 S.Ct. at 1923. Preemption is not necessary where Congress has affirmatively indicated that the Courts have the power to resolve labor actions. For example, Congress has created exceptions to the NLRB's exclusive jurisdiction in 29 U.S.C. § 187, which authorizes anyone injured in his business or property by activity violative of § 8(b)(4) (29 U.S.C. § 158(b)(4)) to recover damages in federal court even though the underlying labor practices might be remediable by the NLRB. Congress could, and did, create the NLRB as the exclusive forum for consideration of certain conduct, but can, and does, create exceptions to that exclusivity. Where Congress has provided remedies for proscribed conduct independent of those available in an NLRB proceeding, the preemption doctrine has no application. If Congress creates such a remedy, then it makes no difference that the conduct is characterized as an unfair labor practice. *Butchers' Union, Local 498 v. SDC Investment, Inc.,* 631 F.Supp. 1001, 1006–07 (E.D.Cal.1986).

■ In addition, where the Court cannot conscientiously presume that Congress meant to intrude into areas traditionally left to local law, preemption is not required. *See Linn v. United Plant Guard Workers, Local 114,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (defamation); *United Automobile, Aircraft and Agricultural Implement Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958) (violence); *United Construction Workers v. Laburnum Construction Company,* 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954) (threats of violence); *Youngdahl v. Rainfair, Inc.,* 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957) (threats of violence); *Sears, Roebuck & Co. v. San Diego County District Council of Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978) (trespass); *Farmer v. United Brotherhood of Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977) (intentional infliction of emotional distress). In the scheme of our federalism, the compelling state interest in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction. *Garmon,* 359 U.S. at 247, 79 S.Ct. at 781; *Sears,* 436 U.S. at 195, 98 S.Ct. at 1756. So long as a state court can order a remedy without interfering with federal policy, the state court may protect important state interests. *Falls Stamping and Welding Co. v. United Automobile Workers, Region II,* 744 F.2d 521, 523 (6th Cir.1984).

■ Further, preemption is not required where the particular rule of law sought to be invoked before another tribunal is so structured that, in virtually all instances, it is safe to presume that judicial supervision will not disserve the interests promoted by the labor statutes. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Federal courts may decide labor questions that emerge as collateral issues in suits brought under independent federal remedies. *Connell Construction Co., Inc. v. Plumbers and Steamfitters Union, Local No. 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). The doctrine of preemption "does not require resort to an expensive and merely delaying administrative proceeding when the case must eventually be decided on a controlling legal issue wholly unrelated to determinations for the ascertainment of which the proceeding was sent to the agen-

cy." *Local Union No. 189, Amalgamated Meat Cutters and Butcher Workmen v. Jewel Tea Co.*, 381 U.S. 676, 686, 85 S.Ct. 1596, 1600, 14 L.Ed.2d 640 (1965).

"[T]he decision to preempt federal or state court jurisdiction over a given class of cases must depend upon the nature of the particular interests being asserted and the effect upon the administration of national labor policies of concurrent judicial and administrative remedies." *Vaca*, 386 U.S. at 180, 87 S.Ct. at 911–12. While a consideration of general principles is important, resolution requires close attention to the particular allegations. *Butchers' Union*, 631 F.Supp. at 1007. "Cases that have held state authority to be pre-empted by federal law tend to fall into one of two categories: (1) those that reflect the concern that 'one forum would enjoin, as illegal, conduct which the other forum would find legal' and (2) those that reflect the concern 'that the [application of state law by] state courts would restrict the exercise of rights guaranteed by the Federal Acts.'" *Lodge 76, International Association of Machinists and Aerospace Workers v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 138, 96 S.Ct. 2548, 2552, 49 L.Ed.2d 396 (1976) (citing *Automobile Workers v. Russell*, 356 U.S. 634, 644, 78 S.Ct. 932, 938, 2 L.Ed.2d 1030 (1958)).

In the matter at hand, it must be determined whether or not any of the exceptions to the preemption doctrine would be applicable to an action grounded in RICO and involving labor relations.

As predicate acts under RICO, Congress has expressly provided that violations of 29 U.S.C. § 186 may create civil liability. 18 U.S.C. § 1961(1). "[T]he fact that § 186—a labor statute—is specifically referenced in RICO is strong confirmation ... that the remedies provided were to be independent of each other. Indeed, it is hard to imagine that Congress would have made § 186 a RICO predicate act without the intention of making violations of § 186, which necessarily arise in the labor context, the basis of a RICO action brought in district court." *Butchers' Union*, 631 F.Supp. at 1007 (citations omitted).

However, the same cannot be said for other labor statutes. No other labor statute is specifically mentioned as a predicate act under RICO. Where allegations seek to predicate liability in a labor matter on violations of generic statutes, "RICO's reference to the generic acts cannot be said to speak, by its terms, to the question of labor law preemption." *Id.* at 1009. The sole inclusion of § 186 violations as predicate acts under RICO "suggests that Congress was being selective as to what activities were being removed from the ambit of the exclusive jurisdiction of labor law." *Id.* at 1009.

The questions in the present case do not involve § 186 violations. Therefore, this action has not been expressly removed from the exclusive jurisdiction of labor law and the NLRB.

The second exception discussed is a judicially-carved exception for states, enabling them to maintain domestic peace. *Garmon*, 359 U.S. at 247, 79 S.Ct. at 781. This exception to the preemption doctrine is not applicable to the present action since it involves the relationship between federal law and federal jurisdiction.

The final exception involves actions where labor questions are collateral issues in suits brought under independent federal remedies, *Connell*, 421 U.S. at 616, 95 S.Ct. at 1830, or involve a rule of law so structured that it is safe to presume that labor interests will be protected. *Vaca*, 386 U.S. at 171, 87 S.Ct. at 903. In certain circumstances, RICO actions could fall under this exception.

■ RICO should be read as limited by the exclusive jurisdiction of the NLRA only when the Court would be forced to determine whether some portion of the defendant's conduct violated labor law before a RICO predicate act would be established. *United States v. Thordarson*, 646 F.2d 1323 (9th Cir.), *cert. denied*, 454 U.S. 1055, 102 S.Ct. 601, 70 L.Ed.2d 591 (1981); *United States v. Boffa*, 688 F.2d 919 (3rd Cir. 1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983); *Butchers' Union*, 631 F.Supp. at 1010–11. So long as the predicate acts exist independent of any

unfair labor practice resolutions, the NLRB's exclusive jurisdiction is not violated since the Court will not be forced to interpret labor law except as a collateral matter. However, if the existence of the predicate acts depends wholly upon a determination that a violation of labor law occurred, jurisdiction is preempted. *Butchers' Union*, 631 F.Supp. at 1009–10. This conclusion is consistent with the policies and purposes of both the NLRA and RICO.[2]

The right of unions to exist is recognized in antitrust legislation. Section 6 of the Clayton Antitrust Act, 15 U.S.C. § 17, "assumes the normal objects of a labor organization to be legitimate, and declares that nothing in the anti-trust laws shall be construed to forbid the existence and operation of such organization, or to forbid their members from *lawfully* carrying out their *legitimate* objects; and that such an organization shall not be held in itself—merely because of its existence and operation—to be an illegal combination or conspiracy in restraint of trade." *Duplex Printing Press Company v. Deering*, 254 U.S. 443, 469, 41 S.Ct. 172, 177, 65 L.Ed. 349 (1921) (emphasis in original). Union success in organizing workers and standardizing wages by use of economic pressure ultimately will affect price competition among employers, but the goals of labor law could never be achieved if this effect on business competition were to be held a violation of antitrust laws. *Connell*, 421 U.S. at 625–26, 95 S.Ct. at 1836–37.

The NLRA works with the Clayton Act "to safeguard the rights of self-organization and collective bargaining, and thus, by the promotion of industrial peace to remove obstructions to the free flow of commerce as defined in the Act." *National Labor Relations Board v. Fansteel Metallur-*

*gical Corp.*, 306 U.S. 240, 258, 59 S.Ct. 490, 497, 83 L.Ed. 627 (1939). However, there is nothing in either the Clayton Act or the NLRA which "exempts such an organization or its members from accountability where it or they depart from its normal and legitimate objects.... And by no fair and permissible construction can it be taken as authorizing any activity otherwise unlawful, or enabling a normally lawful organization to become a cloak for an illegal combination or conspiracy...." *Duplex*, 254 U.S. at 469, 41 S.Ct. at 177.

"There is not a line in the statute [NLRA] to warrant the conclusion that it is any part of the policies of the Act to encourage employees to resort to force and violence in defiance of the law of the land. On the contrary, the purpose of the Act is to promote peaceful settlements of disputes by providing legal remedies for the invasion of the employees' rights." *Fansteel*, 306 U.S. at 257–58, 59 S.Ct. at 497. As a means of achieving labor aims, "[t]he affirmative action authorized is to make these remedies effective in the redress of the employees' rights, to assure them self-organization and freedom in representation, not to license them to commit tortious acts or to protect them from the appropriate consequences of unlawful conduct." *Id.* The methods chosen to conduct a labor dispute are not immune from sanctions simply because the goal is legal. *Connell*, 421 U.S. at 625, 95 S.Ct. at 1836.

The NLRA provides the right to strike but this privilege does not include a license to commit acts of violence. "To justify such conduct because of the existence of a labor dispute or an unfair labor practice would be to put a premium on resort to force instead of legal remedies and to subvert the principles of law and order which

---

**2.** The policy statement for NLRA is expressed in 29 U.S.C. §§ 141 and 151.

The legislative history of RICO demonstrates that it was intended to provide new weapons for an assault on organized crime and seeks to eradicate organized crime and its economic roots. Pub.L. 91–452, 84 Stat. 922. "It is the purpose of this Act to seek the eradication of organized crime in the United States ... by providing enhanced sanctions and new remedies to deal with the unlawful activities of those

engaged in organized crime." *Id.* at 923. Further, Congress directed that "The provisions of this title be liberally construed to effectuate its remedial purpose." *Id.* at 947. The Supreme Court has recognized the significance of the statement and purpose. *United States v. Turkette*, 452 U.S. 576, 588–89, 101 S.Ct. 2524, 2531–32, 69 L.Ed.2d 246 (1981); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 498–99, 105 S.Ct. 3275, 3286–87, 87 L.Ed.2d 346 (1985).

lie at the foundations of society." *Fansteel*, 306 U.S. at 253, 59 S.Ct. at 495. There is abundant opportunity for the operation of the NLRA without construing it as countenancing violence. *Id.* at 256, 59 S.Ct. at 496.

Arson or destruction of property may be prosecuted under state criminal laws whether or not those acts constitute unfair labor practices. *Thordarson*, 646 F.2d at 1331. When violence is used as a means of achieving collective bargaining goals, "[n]othing in the language or legislative history of federal labor legislation suggests that federal criminal statutes—enacted to supplement state criminal sanctions—should not similarly be available to punish union members and officials." *Id.*

RICO is such a federal criminal statute. The effect of RICO is not to make illegal any specific substantive act which was previously legal, since each act punishable under RICO also constitutes a separate offense under state or federal law. Instead, RICO states that if a person commits two or more of these offenses within a ten year period he or she is guilty of a "pattern of racketeering activity" and is subject to additional penalties. *United States v. Local 560, International Brotherhood of Teamsters*, 581 F.Supp. 279, 329 (D.N.J.1984), *aff'd*, 780 F.2d 267 (3d Cir.1985), *cert denied*, 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986). While Congress, in enacting RICO, focused on the type of activities commonly engaged in by organized crime, § 1962 of the Act was written to make unlawful such activities no matter who engages therein. *United States v. Campanale*, 518 F.2d 352, 363 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976).

If the activities alleged in a RICO claim involving a labor entity are such that they would obviously be illegal under any and all circumstances and involving any and all perpetrators, the matter is not so tied to labor law as to make preemption necessary. *Connell*, 421 U.S. at 616, 95 S.Ct. at 1830. The Court can render a decision on the matter without any examination of labor law. For example, murder and destruction of property would be illegal whether or not there was a labor motive or relationship.

No interpretation of labor law is necessary to make a determination of liability. A series of these sorts of illegal activities could establish a "pattern of racketeering activity" for RICO purposes with respect to the entity or entities responsible. In these instances, there would be little possibility that Courts and the NLRB would deliver contradictory decisions having an adverse effect upon labor policy. The "chilling effect" upon the exercise of labor rights would be limited since the activities being discouraged are criminal in nature and not within the scope of activities contemplated by the NLRA. Those who commit such activities are in no doubt as to the illegality of their actions and should know that they can be held responsible. If the requisites of RICO can be established in such cases, those responsible cannot stand behind the NLRA to avoid responsibility.

Such an analysis does not apply when the RICO predicate acts alleged are not illegal per se. In many instances, an unfair labor practice involves activities that but for labor law would be legal. *See Butchers' Union*, 631 F.Supp. at 1011. In such actions, an examination of labor law would be necessary to determine if a violation of the law actually occurred. If an action undertaken in a labor dispute is not illegal per se, the "perpetrator" could not know of the wrongfulness of his actions until a complaint was filed and a decision rendered. In such cases, there is a real possibility that different jurisdictions could render conflicting decisions. Such conflicting decisions could occur in cases alleging these questionable activities as predicate offenses under RICO. There is also the possibility that if the Court were to allow RICO actions based upon predicate acts that are not illegal per se, there could be a "chilling effect" on the exercise of labor rights and the purposes of the NLRA would be defeated. Thus, if there is any question at all about the legality of an action alleged as a predicate act, the action is so tied to labor law as to require preemption to the NLRB.

The parties in the present action have argued that the decision in *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35

L.Ed.2d 379 (1973), indicates the RICO should not be made applicable to actions taken in labor disputes. In *Enmons*, the Supreme Court held that the Hobbs Act (18 U.S.C. §§ 1951 et seq.), which makes it a federal crime to obstruct interstate commerce by robbery or extortion, does not reach the use of violence to achieve legitimate labor objectives.

*Enmons* involved an allegation by an employer that union members who were on strike seeking a new agreement conspired to obstruct commerce and that as part of the conspiracy, the union conspirators obtained property of the employer in the form of wages and other things of value, with the consent of the company being induced by the wrongful use of force, violence, and the fear of economic injury and that actual threats and violence occurred.

In interpreting the Hobbs Act, the Court focused on the word "wrongful" contained in the definition of extortion (18 U.S.C. § 1951(b)(2)) and reasoned that because it would be redundant to speak of "wrongful violence" or "wrongful force", Congress must have intended "wrongful" to limit "the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." *Enmons*, 410 U.S. at 399–400, 93 S.Ct. at 1009–10. The Court held that violence to achieve legitimate union objectives is not within the Hobbs Act's prohibition because there is no "wrongful" taking of an employer's property when union members receive wages and benefits for genuine services bargained for by the employer. *Id.* at 400, 93 S.Ct. at 1010.

The Court was also concerned with the fact that "wrongful" use of force to obtain legitimate labor goals was subject to an overly broad interpretation which "would cover all overtly coercive conduct in the course of an economic strike, obstructing, delaying, or affecting commerce." *Id.* at 410, 93 S.Ct. at 1015. This interpretation would subject a worker who, on the spur of the moment, threw a punch on a picket line, or a "striker who deflated the tires on his employer's truck would be subject to a Hobbs Act prosecution and the possibility of 20 years' imprisonment and a $10,000

fine." *Id.* The Court recognized that the violence committed in the course of the labor dispute would, however, be punishable under state criminal law. *Id.* at 398, 93 S.Ct. at 1009. The Court also recognized that the Hobbs Act could be applied in labor actions where there was no legitimate labor purpose involved. *Id.* at 408, 93 S.Ct. at 1014.

The *Enmons* Court found support for its decision in the legislative history of the Hobbs Act. *Id.* at 401–08, 93 S.Ct. at 1010–14. The legislative history was read by the Court as evidencing a Congressional intent to preserve in the Hobbs Act an exemption existing in the predecessor Act for violence occurring in pursuit of legitimate collective bargaining objectives. *Id.*

Courts which have examined violence occurring in a labor context have narrowly interpreted the "*Enmons* doctrine". *See Thordarson*, 646 F.2d at 1323; *United States v. Chambers*, 515 F.Supp. 1 (N.D. Ohio 1981). In *Chambers*, an action involving prosecution for malicious destruction of property by means of an explosive during the course of a labor dispute, the Court held that 18 U.S.C. § 844(i) did not create an exception, implied or expressed, for acts in furtherance of legitimate labor objectives. *Chambers*, 515 F.Supp at 2. The Court refused to interpret *Enmons* as creating an immunity for union members for any acts, otherwise unlawful, committed in the course of a labor dispute. *Id.* at 3.

In *Thordarson*, a labor RICO action, the Court observed that "[t]o carve out a narrow exemption from a federal extortion statute on the basis of its language and legislative history, as the Supreme Court did in *Enmons*, is one thing; to exempt a wide range of violent behavior from all federal criminal liability, despite plain language that prohibits such conduct is quite another." *Thordarson*, 646 F.2d 1330. The Court read *Enmons* "as holding only that the use of violence to secure legitimate collective bargaining objectives is beyond the reach of the Hobbs Act." *Id.* at 1327. The Court found no basis for the creation of an "*Enmons* doctrine" placing all violence occurring during the course of legit-

imate labor activity beyond the reach of all federal criminal statutes. *Id.*

This Court is in agreement with the *Thordarson/Chambers* interpretation of *Enmons.* To interpret otherwise would effectively immunize from federal criminal prosecution unions and employers who consistently resort to violence and other illegal activities to achieve their objectives. Thus, it is held that a RICO action may proceed where the alleged predicate offenses occurred in a labor context if the acts are offenses independent of labor law. The Court recognizes the caution which must be exercised in determining which actions may proceed under RICO and which are merely unfair labor practices requiring preemption to the NLRB but believes that the intent of Congress with respect to both the NLRA and RICO are best served by this conclusion.[3]

■ It must now be determined whether or not the present actions meet this test and may proceed under RICO.

It has been alleged that the defendants/third party plaintiffs committed multiple acts of violence, including murder and arson, in their attempts to become the recognized bargaining agent at the plaintiffs' mines. These alleged acts have been set out with specificity in the complaint. Such acts, if proven, constitute criminal offenses under state law and are sufficient to meet the § 1961(1) definition of "racketeering activity". Such actions are also sufficiently independent of labor law that a Court hearing a RICO claim based upon such predicate offenses would *not* need to examine labor law except as a collateral matter. It is only these alleged criminal activities which will be examined with the RICO claim in the present action. In effect, the union and its members will be treated as if they were in fact two "conspiracies"—one legitimate combination which acted to further the goals of collective bargaining by use of activities protected by the NLRA and a second combination which allegedly conspired and effected criminal actions to achieve its aims. The

union and its members are exempt from RICO prosecution for their lawful activities but may be held liable for patently criminal actions should the requisites for that liability be established.

Thus, the defendant/third party plaintiffs' motion for dismissal on the grounds that the Court's jurisdiction is preempted by the NLRA will be denied.

■ On the other hand, one part of the third party complaint and counterclaim alleges that the plaintiff/third party defendants plotted to defraud the third party plaintiffs out of their jobs and benefits through a scheme of corporate ownership and asset manipulation for the purpose of evading obligations imposed by collective bargaining agreements. The actions alleged, *e.g.* asset switches and lease arrangements, are often accomplished within the sphere of legitimate corporate activity and would not be unlawful but for labor law if it is shown that such actions were actually taken to avoid the obligations enforceable under the NLRA. The Court would be forced to examine the actions and their relationship with labor law to determine if, in fact, unlawful activity occurred.

Thus, the plaintiff/third party defendants' motion to dismiss is granted to the extent that these actions are alleged as RICO predicate offenses. They are preempted by the NLRA.

However, the third party plaintiffs also allege that certain patently violent activities occurred, *e.g.* arson and assault. To the degree that these actions are claimed as predicate offenses, the third party and counterclaim defendants' motion to dismiss on preemption grounds is denied.

## II. RICO

### A. Generally

"RICO ... is a broadly worded statute whose purpose is to provide a private civil remedy to those injured by the infiltration of organized crime into the legitimate business arena." *Papai v. Cremosnik,* 635

---

**3.** For a thorough and well-written discussion of RICO and preemption by the NLRB, see generally Note, *The Exclusive Jurisdiction of the NLRB as a Limitation on the Application of RICO to Labor Disputes,* 76 Ky.L.J. 201 (1987–88).

F.Supp. 1402, 1406 (N.D.Ill.1986). RICO's substantive provision, 18 U.S.C. § 1962, "is violated by any person associated with an enterprise, the activities of which affect commerce, who conducts the enterprise's affairs through a pattern of racketeering activity." *Illinois Department of Revenue v. Phillips,* 771 F.2d 312, 312 (7th Cir.1985). Each element in a RICO count must be pled to state a claim. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Conducting an enterprise that affects interstate commerce is not in itself a violation of Section 1962, nor is the mere commission of the predicate offenses. *Id.* Each element of RICO must also be proven in order to establish liability. *Cf. United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). While the proof used to establish the "enterprise" and the "pattern of racketeering activity" may coalesce, each is a separate element which must be proven. *Id.*

Moreover, a "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima,* 473 U.S. at 496, 105 S.Ct. at 3285–86. "A defendant who violates § 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured." *Haroco, Inc. v. American National Bank & Trust Co. of Chicago,* 747 F.2d 384, 398 (7th Cir. 1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985).

### B. Pattern of Racketeering Activity

▪ All defendants, counterclaim defendants, and third party defendants have claimed that the pleadings of RICO "patterns of racketeering activity" are insufficient as a matter of law. This Court has not yet made a determination as to what standard will be used to determine whether a "pattern" exists and must reach a conclusion on this point before determining if the parties' pleadings are sufficient.

In *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court offered a comment upon the "pattern" requirement of a civil RICO action. While not ruling on the issue, the Court suggested that a bald inquiry into the number of alleged predicate acts would not suffice to establish a "pattern" for the purpose of the Act. The Court reasoned that RICO did not target sporadic activity, no matter how many separate instances were alleged, and suggested that proper review of a RICO complaint on motion to dismiss would scrutinize the pleadings for allegations of a "pattern" characterized by "continuity plus relationship."

[T]he definition of "pattern of racketeering activity" differs from the other provisions in § 1961(5) (emphasis added), not that it "means" two such acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business requires more that one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong.Rec. 18940 (1970) (statement of Sen. McClellan). *See also id.,* at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender"); House Hearings at 665. Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e). This language may be

useful in interpreting other sections of the Act. Cf. *Iannelli v. United States*, 420 U.S. 770, 789 [95 S.Ct. 1284, 1295–96, 43 L.Ed.2d 616] (1975). *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.

"[O]ne can never forget the underlying purposes of RICO when considering whether a given factual scenario forms a RICO pattern." *Meadow Limited Partnership v. Heritage Savings and Loan Association*, 639 F.Supp. 643, 650 (E.D.Va.1986). RICO was designed as an "aggressive initiative to supplement old remedies and develop new methods for fighting crime." *Sedima*, 473 U.S. at 498, 105 S.Ct. at 3286. Congress intended RICO to bar the infiltration of legitimate businesses by organized crime by separating racketeers from their profits. *Russello v. United States*, 464 U.S. 16, 26–28, 104 S.Ct. 296, 302–303, 78 L.Ed.2d 17 (1983). "The pattern requirement, especially with its continuity aspect, neatly dovetails with this purpose." *Meadow*, 639 F.Supp. at 650.

Moreover, this two-part pattern requirement is a sound concept. As one court stated:

> Requiring both continuity and relationship among predicate acts for the pattern requirement to be met is a sound theoretical concept that is not easily accomplished in practice. This is because the terms "continuity" and "relationship" are somewhat at odds with each other. Relationship implies that the predicate acts were committed somewhat closely in time to one another, involve the same victim, or involve the same type of misconduct. Continuity, on the other hand, would embrace predicate acts occurring at different points in time or involving different victims. To focus excessively on either continuity or relationship alone effectively negates the remaining prong.

*Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986).

The Courts have struggled to implement *Sedima's* directive to develop a meaningful concept of continuity plus relationship. *See e.g., Torwest DBC, Inc. v. Dick*, 810 F.2d 925 (10th Cir.1987); *Superior Oil Company v. Fulmer*, 785 F.2d 252 (8th Cir.1986); *Schreiber Distributing Co. v. Serv–Well Furniture Company*, 806 F.2d 1393 (9th Cir.1986); *Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322 (7th Cir.1986); *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir.1986); *Holmberg v. Morrisette*, 800 F.2d 205 (8th Cir.1986), *cert denied*, —— U.S. ——, 107 S.Ct. 1953, 95 L.Ed.2d 526 (1987); *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22 (1st Cir.1987); *Condict v. Conduit*, 815 F.2d 579, *superceded*, 826 F.2d 923 (10th Cir.1987); *Systems Research, Inc. v. Random, Inc.*, 614 F.Supp. 494 (N.D.Ill.1985); *R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350 (5th Cir.1985); *Soper v. Simmons International, Ltd.*, 632 F.Supp. 244 (S.D.N.Y.1986); *Temporaries, Inc. v. Maryland National Bank*, 638 F.Supp. 118 (D.Md.1986); *Graham v. Slaughter*, 624 F.Supp. 222 (N.D.Ill.1985); *Papai v. Cremosnik*, 635 F.Supp. 1402 (N.D.Ill.1986). "Development of a uniform concept has been hampered by *Sedima's* instruction to read limitations into the statutory definition even though the Act is to be broadly construed, *Sedima* [473 U.S. at 497, 105 S.Ct.] at 3286, by the myriad of diverse fact patterns underlying civil RICO suits, and by the abstract nature of the Court's references to continuity and relationship." *Torwest*, 810 F.2d at 928.

Case law suggests that "relationship" requires two or more acts of racketeering which are part of a common scheme and which are related to the operation of the enterprise. *United States v. Sinito*, 723 F.2d 1250 (6th Cir.1983), *cert denied* 469 U.S. 817, 105 S.Ct. 86, 83 L.Ed.2d 33 (1984). In this sense, the acts are "related" to each other by having a common purpose, namely the conducting of the enterprise's affairs. *Id.* The concept of "relationship" can also be interpreted to mean similarity of purpose. *Papai*, 635 F.Supp. at 1407–08. "However, similarity of acts, *i.e.* two acts of mail fraud rather than one act of fraud and one of arson, is not required by the statute." *Id.* at 1408 (citing *Sinito*, 723 F.2d at 1261).

Very little discussion has centered around the relationship requirement. It is generally accepted that when two or more

predicate acts are shown to be part of a common scheme, the relationship requirement has been satisfied. *See, e.g., Superior Oil,* 785 F.2d at 252.

The "continuity" requirement of the pattern concept has been harder to identify and articulate a useful standard. The courts have generally agreed that to make an adequate showing of continuity, a plaintiff must demonstrate some facts from which at least a threat of ongoing illegal activity may be inferred. *See, e.g., Roeder,* 814 F.2d 30. "Among other things, continuity indicates whether a defendant's conduct is something more than isolated (*i.e.,* non-racketeering criminal activity)." *Meadow,* 639 F.Supp. at 650. "The inquiry should be concerned with whether the conduct establishes a reliable sample of traits or other observable features that can be said to constitute a pattern of behavior." *Torwest DBC, Inc. v. Dick,* 628 F.Supp. 163, 167 (D.Colo.1986), *aff'd,* 810 F.2d 925 (10th Cir.1987). As one court stated:

> The obvious purpose of the continuity plus relationship formation is to narrow the "pattern" concept to reach RICO's intended goal—enterprises which utilize similar methods of operation and whose victims are harmed in similar manners by the operation of the particular racket. It is this kind of continuous ongoing enterprise that poses the "threat of continuing criminal activity" and it is this kind of enterprise that civil RICO has as its primary target.

*Fleet Management Systems v. Archer–Daniels–Midland Co.,* 627 F.Supp. 550, 559 (D.C.Ill.1986).

Three distinct standards have developed for determining whether or not the continuity aspect of a pattern has been established.

The majority of the courts which have examined the issue have concluded that the continuity element requires that the predicate racketeering act alleged in the complaint occur in different criminal "episodes"; a single unlawful transaction does not give rise to a civil RICO claim, even if the transaction was accomplished through a number of constituent offenses. *See Superior Oil v. Fulmer,* 785 F.2d 252 (8th Cir.1986); *Modern Settings v. Prudential–*

*Bache Securities Inc.* 629 F.Supp. 860 (S.D.N.Y.1986); *Medical Emergency Service Associates v. Foulke,* 633 F.Supp. 156 (N.D.Ill.1986); *Allright Missouri, Inc. v. Billeter,* 631 F.Supp. 1328 (E.D.Mo.1986), *aff'd in part, rev'd in part,* 829 F.2d 631 (8th Cir.1987); *Dunham v. Independence Bank of Chicago,* 629 F.Supp. 983 (N.D.Ill. 1986); *Torwest DBC, Inc. v. Dick,* 628 F.Supp. 163 (D.Colo.1986) *aff'd* 810 F.2d 925 (10th Cir.1987); *Medallion TV Enterprises, Inc. v. SelecTV of California of California,* 627 F.Supp. 1290 (C.D.Cal. 1986), *aff'd* 833 F.2d 1360 (9th Cir.1987); *Fleet Management Systems, Inc. v. Archer–Daniels–Midland Co.,* 627 F.Supp. 550 (C.D.Ill.1986); *Allington v. Carpenter,* 619 F.Supp. 474 (D.C.Cal.1985); *Professional Assets Management, Inc. v. Penn Square Bank,* 616 F.Supp. 1418 (W.D.Okla.1985); *Northern Trust Bank/O'Hare, N.A. v. Inryco,* 615 F.Supp. 828 (N.D.Ill.1985); *Exeter Towers Associates v. Bowditch,* 604 F.Supp. 1547 (D.Mass.1985).

These courts have concluded that "RICO's reference to a 'pattern' of racketeering activity was directed towards individuals who demonstrate a propensity to engage in continuous or ongoing criminal activity rather than isolated acts." *B.J. Skin & Nail Care, Inc. v. International Cosmetic Exchange,* 641 F.Supp. 563, 565 (D.Conn.1986). And, that "[w]hile Congress chose to make clear that a 'pattern of racketeering activity' *required* the commission of at least two predicate acts, nothing in the statute demonstrates an intent to depart from the ordinary meaning of the word 'pattern' by permitting courts to find that two illegal acts committed as part of a single fraudulent scheme as sufficient to impose liability under RICO." *Id.* (emphasis in original). The mere fact that a transaction is complex and requires numerous predicate activities is not sufficient to establish a pattern where, although these predicate acts are ongoing over a period of time and seem to constitute separate transactions, they in fact involve a single "scheme". *Morgan,* 804 F.2d at 976. As was stated by the court in *Inryco,* 615 F.Supp. at 831, "the continuity inherent in the word pattern presumes repeated crimi-

nal *activity*, not merely repeated *acts* to carry out the *same* criminal activity. It places a real strain on the language to speak of a single fraudulent effort, implemented by several fraudulent acts, as a 'pattern of racketeering activity'." (emphasis in original). The *Inryco* court concluded that "a single scheme does not appear to represent the necessary 'pattern of racketeering activity'." *Id.* at 833.

In determining the existence of "multiple episodes", the courts have determined that the acts must be "sufficiently unconnected in time or substance to warrant consideration as separate criminal episodes." *Allington*, 619 F.Supp. at 478. Acts undertaken in furtherance of a single transaction and performed within a limited period of time are insufficient to establish a pattern. *Roeder*, 814 F.2d at 31. A scheme to achieve a single discrete objective does not in and of itself create a threat of ongoing activity, even when that goal is pursued by multiple illegal acts, because the scheme ends when the purpose is accomplished. *Cf. Lipin*, 803 F.2d at 324. "If two or three acts taken pursuant to the same episode (i.e. 'related' acts) were sufficient make out a 'pattern', the 'continuity' requirement of *Sedima* would be meaningless." *Forstmann v. Culp*, 648 F.Supp. 1379, 1388 (M.D.N.C.1986).

A second group of courts have decided that so long as the predicate acts alleged are sufficiently related and are of a kind RICO was designed to deter, more precisely, those listed in the statute, the pattern requirement has been established. *See Systems Research*, 614 F.Supp. at 494; *R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350 (5th Cir.1985); *Conan Properties, Inc. v. Mattel, Inc.*, 619 F.Supp. 1167 (S.D. N.Y.1985). The Court in *United States v. Ianniello*, 808 F.2d 184, 192 (2nd Cir.1986), *cert denied*, —— U.S. ——, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987), criticized the "multiple episode view" stating that a requirement that as part of the definition of "pattern", proof that the defendants engaged in more than one scheme is a "strained and inappropriate reading of the statutory language" and undercuts § 1962(b). The court viewed this provision as not prohibiting an enterprise which is committing predicate acts but rather as prohibiting predicate acts aimed at taking over an enterprise. *Ianniello*, 808 F.2d at 192. The court determined that "[t]o require two schemes as part of the *definition* of pattern under § 1961(5) would effectively eliminate" § 1962(b) and held "that when a person commits at least two acts that have a common purpose of furthering a criminal enterprise with which that person is associated, the elements of relatedness and continuity ... are satisfied." *Id.*

Both these views have been criticized, the first as being too narrow an interpretation of the *Sedima* requirement and the second as being too broad. *Louisiana Power & Light Company v. United Gas Pipe Line Company*, 642 F.Supp. 781, 808–09 (E.D.La.1986). The opinion was critical of the *Inryco* and *Superior Oil* decisions and pointed out that a plaintiff who desires to pursue a RICO action in a jurisdiction accepting the "multiple episode" theory of continuity would be required to show that the defendant was engaged in similar schemes elsewhere and involving other persons, actions which are not necessarily relevant to the plaintiff's suit and for which the plaintiff may not have standing to raise or investigate, or to show that the defendant damaged the plaintiff by more than one criminal scheme, a view which fails to perceive an ongoing open-ended scheme. *Id.* The Court was also critical of the "two related acts" standard, noting that it brings too many common fraud actions into federal court under RICO and would result in the imposition of the "onerous" RICO damages on those who harm others once through a series of actions. *Id.* at 809. RICO was intended to punish those who harm others in a *continuous*, systematic way. *Id.*

A third set of cases have reasoned that a more flexible and accurate approach to identifying patterns would be "to require either 1) more than one scheme or 2) an open-ended continuous scheme which contains a multiplicity of predicate acts." *Temporaries, Inc.*, 638 F.Supp. at 123. In *Graham*, 624 F.Supp. at 225, the court held that to be "continuous", more than sporadic or isolated activity must be alleged;

there need be more than a single transaction but not necessarily more than a single scheme. In other words, while a RICO action must involve different criminal "episodes", *i.e.* transactions somewhat separated in time and place, an open-ended scheme may include a sufficient number of independent episodes to satisfy the continuity requirement. *Soper*, 632 F.Supp. at 253. An open-ended continuous scheme should be defined on a case by case basis taking into consideration such factors as the number and variety of predicate acts and the length of time over which distinct injuries occur. *Temporaries, Inc.*, 638 F.Supp. at 123. This standard of "multiple episodes evincing a regular, ongoing course of conduct" not only satisfies the continuity requirement but also adds the needed depth to the multiple episode requirement. *Papai*, 635 F.Supp. 1413.

The Supreme Court has indicated that a meaningful concept of "pattern" should be developed. *Sedima*, 473 U.S. at 500, 105 S.Ct. at 3287. We have carefully examined the post-*Sedima* decisions and conclude that the standard for determination of a "pattern", as stated in *Papai*, 635 F.Supp. at 1413, requires "multiple episodes evincing a regular, ongoing course of conduct". This would seem to achieve the results intended by Congress by its enactment of RICO. Such a standard is broad enough to draw into the scope of RICO those parties who, as a common practice, resort to criminal activities to achieve their goals—whether their actions constitute multiple schemes or a single open-ended scheme involving numerous activities over an extended period of time—yet it is narrow enough to exclude the first time offender who takes several actions to achieve a single goal within a limited span of time. It is important to remember that such a decision does not relieve the first time offender of all criminal liability, it only relieves him of the onerous additional penalties under RICO. Additionally, should the first time offender succumb to illegal activity for a second time at a later date, he could be prosecuted under RICO at that time. It must also be recognized that RICO is not merely a recidivist statute and that all of the other pre-

requisites to the institution of an action under these provisions must be met.

In the present action, the plaintiffs have alleged that the defendant International Union has, for at least the last ten years preceding the filing of this action, conducted its activities, and its officers have conducted and participated in the International Union's activities, in disregard of state and federal laws prohibiting acts and threats of assault, battery, murder, arson, interstate travel for the purpose of conducting such activities, and interference with interstate commerce. They have alleged that the violence is neither purposeless nor random but occurs in an effort to require mine owners to accede to union demands or to cease operation. It is contended that the purpose of the violent activity is to avoid legitimate organizing activity in favor of intimidation and coercion of employees and employers alike through inculcation of fear and dread of physical injury, including death, and to prevent an employer from disagreeing with or dissenting from a goal or objective of the International Union, legitimate or otherwise from actively conducting such employer's lawful business activity without conforming to the dictates of the International Union. It is alleged that the illegal conduct has occurred at numerous coal mining operations throughout the United States.

The plaintiffs have noted violent activities at mining operations in Kentucky and West Virginia Mines within the area represented by the International Union, District 30 and Local 2496. There are particularized statements as to the alleged numerous illegal activities which occurred at the plaintiffs' Loftis mine. Such allegations are sufficient to state a claim of "regular, ongoing illegal activities" on the part of the union and its members for purposes of the pattern requirement. Therefore, sufficient acts have been alleged which are related to a course of conduct and which occurred over a period of time.

Thus, the defendant's motion to dismiss on the grounds that there has been an insufficient allegation of a RICO pattern is denied.

In their counterclaim and third party complaint, the defendants have alleged a series of activities involving corporate manipulation. These activities have been determined to involve claims that are within the exclusive jurisdiction of the NLRB and, as such, these claims, and the actions related thereto, will not be considered in determining the sufficiency of the allegation of a RICO pattern. The remaining illegal activities alleged, the violence, meet the definition and requisite number of racketeering activities required by RICO. However, they all occurred within a limited span of time and were all concerned with a single objective—as stated in the complaint—to keep the Loftis mine "union free." The defendants/third party plaintiffs have offered no evidence that the counterclaim and third party defendants have committed similar offenses in the past or at other mining sites. Therefore, evidence of a "regular, ongoing course of illegal activity" sufficient to support an allegation of a RICO *pattern* of racketeering activity has not been provided.

Thus, the counterclaim and third party defendants' motions for dismissal on the grounds that there has been a failure to allege a RICO pattern is granted.

### C. Enterprise

In order to prove a violation of RICO, a plaintiff must establish the existence of both a "pattern of racketeering activity" and an "enterprise". *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). The defendants, counterclaim defendants, and third party defendants have claimed that the complaints filed against them fail to sufficiently allege the existence of an "enterprise." Since it has already been determined that the counterclaim and third party complaint failed to sufficiently allege the requisite "pattern of racketeering activity", there is no need to consider whether or not there was a sufficient allegation as to the existence of an enterprise with respect to the defendants in those actions. All that will be considered is whether or not an enterprise existed with respect to the defendants in the original action.

"The term 'enterprise' must signify an association that is substantially different from the acts which form the 'pattern of racketeering activity'" since to permit a "contrary interpretation would alter the essential elements of the offense as determined by Congress." *United States v. Anderson,* 626 F.2d 1358, 1365 (8th Cir. 1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). Although the proof used to establish these separate elements may coalesce, proof of one does not necessarily establish the other. *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2529. However, proof of these separate elements does not have to be distinct and independent, as long as the proof offered is sufficient to satisfy both elements. *United States v. Qaoud,* 777 F.2d 1105, 1115 (6th Cir.1985), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 899 (1986).

An enterprise is defined by 18 U.S.C. § 1961 (4) as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." There is no restriction upon the associations embraced by the definition: an enterprise includes any union or group of individuals associated in fact for a common purpose of engaging in a course of conduct, be it a legitimate or an illegitimate organization. *Turkette,* 452 U.S. at 580–83, 101 S.Ct. at 2527–29. An enterprise is proven by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. *Id.* "This does not mean that the scope of the enterprise cannot change as it engages in diverse forms of activity nor does it mean that the participants in the enterprise cannot vary with different individuals managing its affairs at different times and in different places. What is essential, however, is that there is some continuity of both purpose and personality." *United States v. Bledsoe,* 674 F.2d 647, 665 (8th Cir.), *cert denied,* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). Moreover, it must be shown that the enterprise had "an ascertainable structure which exists for the purpose of maintaining operations directed toward an economic goal that has an existence that can be defined apart from the commission of

the predicate acts constituting the 'pattern of racketeering activity.'" *Anderson,* 626 F.2d at 1372.

The ordinary meaning of the word "enterprise" is "an undertaking or project or a unit of organization established to perform any such undertaking or project." *Bledsoe,* 674 F.2d at 664.

> However, under RICO, an enterprise cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts. Any two criminal acts will necessarily be surrounded by some degree of organization and no two individuals will ever jointly perpetrate a crime without some degree of association apart from the crime itself. Thus unless the inclusion of the enterprise element requires proof of some structure separate from the racketeering activity and distinct from the organization which is a necessary incident to the racketeering, the Act simply punishes the commission of two of the specified crimes within a 10–year period
>
> . . . .
>
> ... [T]he severe penalties authorized by RICO that the Act must have been directed at participation in enterprises consisting of more than simple conspiracies to perpetrate the predicate acts of racketeering.... If the enterprise requirement is satisfied by proof of conspiracy or looser associations not characterized by conspiratorial consent, ... the Act is merely a recidivist statute.

*Id.* This clearly could not have been the intention of Congress since the United States Code contained such statutes prior to the enactment of RICO (*see, e.g.,* 18 U.S.C. § 3575 (e)(1)). *Id.* "The distinct structure might be demonstrated by proof that a group engaged in a diverse pattern of crimes or that it has an organizational pattern or system of authority beyond what was necessary to perpetrate the predicate crimes." *Id.* at 665.

In addition, in order to violate § 1962(c), a person must be "employed by or associated with" an enterprise and must "participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "[O]ne conducts the activities of an enterprise through a pattern of racketeering when (1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of the enterprise." *United States v. Scotto,* 641 F.2d 47, 54 (2nd Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). The commission of "predicate acts which are unrelated to the enterprise or one's position within it would be insufficient." *Id.*

Where the RICO enterprise charged is not a legal entity, but merely a group of individuals "associated in fact", there is a danger of guilt by association. *Bledsoe,* 674 F.2d at 664–65. Therefore, proof is required that the enterprise with which the individuals were associated had certain distinct characteristics. *Id.*

> Proof of the existence of an associated in fact enterprise requires proof of a "common purpose" animating its associates, and this may be done by evidence of an "ongoing organization, formal or informal," of those associates in which they function as a "continuing unit." The ties between the individual associates that are implied by these concepts of continuity, unity, shared purpose and identifiable structure operate precisely to guard against the danger that guilt will be adjudged solely by virtue of associations not so related. They defined the line between "concerted action" through "group association for criminal purpose," for which "combination in crime" may constitutionally be proscribed, ... and less clearly related conduct that may not be so proscribed and prosecuted.

*United States v. Griffin,* 660 F.2d 996, 999–1000 (4th Cir.1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 313 (1982).

A number of courts have also determined that § 1962(c) requires separate entities as the liable person and as the enterprise. *See e.g., Haroco, Inc. v. American National Bank & Trust Co.,* 747 F.2d 384, 400 (7th Cir.1984), *aff'd* 473 U.S. 606, 105 S.Ct.

3291, 87 L.Ed.2d 437 (1985); *United States v. Computer Science Corporation*, 689 F.2d 1181, 1190 (4th Cir.1982); *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Bennett v. United States Trust Co. of New York*, 770 F.2d 308 (2nd Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir.1984); *Ross v. Omnibusch, Inc.*, 607 F.Supp. 835 (W.D.Mich 1984); *Hirsch v. Enright Refining Co.*, 751 F.2d 628 (3rd Cir.1984); *Van Dorn Company v. Howington*, 623 F.Supp 1548 (N.D.Ohio 1985). These courts have concluded that requiring a complaint to distinguish between the enterprise and the person conducting the affairs of that enterprise in a prohibited manner comports with the legislative intent and policy since it focuses the section on the culpable party and recognizes that the enterprise is often the passive instrument or victim of the racketeering activity. *Bennett*, 770 F.2d at 315; *Hirsch*, 751 F.2d at 633.

There are, however, several jurisdictions which have concluded that an enterprise existed where it was no more than the sum of the predicate acts. *See United States v. Bagaric*, 706 F.2d 42, 55 (2nd Cir.1983), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 134, 78 L.Ed.2d 128 (1983); *United States v. Weinstein*, 762 F.2d 1522 (11th Cir.1985), *cert. denied*, 475 U.S. 1110, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986). These decisions reflect the belief that a group of individuals may join together and be "associated in fact", although not a legally cognizable entity in one of the traditional forms, solely for the purpose of conducting their activities. *Bagaric*, 706 F.2d at 56–57. These courts deemed it logical to characterize a group by what it does rather than by an abstract analysis of its structure. *Id.* In *United States v. Hartley*, 678 F.2d 961, 988 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983), the court determined that a corporation could "simultaneously" be both the RICO defendant and the enterprise. The court accepted a hypothesis offered by the prosecution that "if an individual were named as the enterprise," as permitted by the definition of enterprise in 18 U.S.C. § 1961(4), "and a

group of persons engaged in a pattern of racketeering activity with that individual, it would defy reason to suggest that the central figure (the enterprise) could not also be prosecuted under RICO" and that the same theory would apply where the enterprise was a corporation. *Id.* at 989. In addition, the court noted that "[t]here is no distinction for enterprise purposes, between a duly formed corporation that elects officers and holds annual meetings and an amoeba-like infrastructure that controls a secret criminal network." *Id.* Drawing an analogy from corporation law, the court determined that a corporation can be viewed in a different light depending upon the roles it assumes in the action. As a defendant, it can maintain its separate legal status as an ongoing business venture but by "piercing the corporate veil", it can be revealed as an association of individuals working as a unit to accomplish a common purpose. *Id.* Viewed in this manner, it takes the form of a "group of individuals associated in fact." Evidence of this ongoing nature, and of the fact that the various associates function as a continuing unit satisfies the enterprise element of RICO. *Id.* The court rejected the argument that it would be punishing the innocent entity being used as a tool for perpetrating illegal activities by pointing out that "[w]ith the advantages of incorporation must come the appendant responsibilities" and that "a corporation is liable for the acts of its agents and employees." *Id.* at 988–89 n. 43.

The *Hartley* decision was used as support in *United States v. S & Vee Cartage Co.*, 704 F.2d 914, 920 (6th Cir.1983), *cert. denied*, 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983), where it was determined that a corporation can be convicted of conspiracy with its officers.

The difficulty in accepting the theory of intra-corporate conspiracy is conceptual. Under elementary agency principles, a corporation is personified through the acts of its agents. Thus, the acts of its agents become the acts of the corporation as a single entity. The conceptual difficulty is easily overcome, however, by acknowledging the underlying purpose for the creation of this fiction—to expand

corporate responsibility ... The fiction was never intended to prohibit the imposition of criminal liability by allowing a corporation to hide behind the identity of the other.

*Hartley,* 678 F.2d at 970. This view has been adopted by several jurisdictions. *See United States v. Peters,* 732 F.2d 1004, 1007–08 (1st Cir.1984); *United States v. American Grain & Related Industries,* 763 F.2d 312,320 (8th Cir.1985).

The same principles will apply in an instance involving an unincorporated organization, such as the unions in the case at hand, where the organization has an established and ongoing elected hierarchy which meets on a regular basis. The various levels of the hierarchy and the individual members cannot "hide behind the identity" of each other to avoid liability. Through the union elective process, the members of the union appoint the officers of the various levels of the hierarchy to be their agents and to conduct the day to day business of the union. If the authorized agents use their positions to perpetrate or authorize the perpetration of activities, defined by RICO as racketeering activities, to further the interests of the union, the various levels of the organization and the individual members involved cannot disclaim responsibility.

In the present case, a liberal reading of the plaintiffs' RICO claim indicates that the enterprise element has been sufficiently pled to withstand the defendants' motion to dismiss. The plaintiffs have alleged that the pickets at the Loftis mine constituted an enterprise and that the operation and distribution of the union strike fund is an enterprise. These operations are conducted by the various levels of the union and by individual members. This combination may be considered to be an "association in fact" within the definition of a RICO enterprise. While the claim is rather poorly worded, it cannot be said that the plaintiffs can prove no set of circumstances regarding the existence and operation of these entities which would grant them relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

The grant of a motion to dismiss pursuant to F.R.Civ.P. 12(b)(6) is appropriate only when it appears that the plaintiffs can prove no set of facts in support of their claims which would entitle them to relief. In ruling upon the motion, the Court must view the complaint in the light most favorable to the plaintiffs and resolve every doubt in their behalf. *Jenkins v. McKeithen,* 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Davis H. Elliot Co. v. Caribbean Utilities Co.,* 513 F.2d 1176, 1182 (6th Cir.1975). Moreover, any inference that may be reasonably drawn or construed from the plaintiff's complaint shall be considered together with the allegations.

Thus, the defendants' motion to dismiss for failure to adequately allege the existence of an enterprise must be denied.

### III. Statute of Limitations

RICO was enacted as part of the Organized Crime Control Act of 1970 and provides for both criminal and civil penalties. 18 U.S.C. §§ 1963 and 1964. Criminal prosecutions under RICO are subject to the general federal five-year statute of limitations contained in 18 U.S.C. § 3282 (1982). *See e.g., United States v. Cody,* 722 F.2d 1052, 1056 (2nd Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984). The civil provisions, however, do not specify a particular limitations period. 18 U.S.C. § 1964. In an action decided June 22, 1987, the Supreme Court held that the 4-year statute of limitations period applicable to Clayton Act civil enforcement actions applies in RICO civil enforcement actions. *Agency Holding Crop. v. Malley–Duff & Associates, Inc.,* —— U.S. ——, 107 S.Ct. 2759, 97 L.Ed. 2d 121 (1987). Since RICO cases commonly involve interstate transactions, the Court determined that the dangers of forum shopping and of complex, expensive, and unnecessary litigation regarding limitations periods could be avoided by applying a uniform statute of limitations to all civil RICO actions. In addition, application of a uniform limitations period avoids the possibility that the application of an unduly short limitations period would thwart the legislative purpose of providing an effective remedy. *Id.* The limitations period of the Clayton Act was selected because it

provided a closer analogy to RICO than any other statute. RICO was patterned after the Clayton Act and is similar in purpose and structure. *Id.*

The statute of limitations begins to run for a RICO action when the plaintiff knows or has reason to know of the injury which is the basis of his action. *Compton v. Ide,* 732 F.2d 1429, 1433 (9th Cir.1984).

All activities alleged in the action at hand occurred within the four year period prior to the filing of the RICO action. Thus, the RICO action is not time barred.

■■■■ The pendant state claim involving an individual's allegation of personal injury is governed by KRS § 413.140(1)(a), which provides that an action for injury to the person must be commenced within one year after the action accrues. The individual alleging personal injury claims that the tortious activity occurred on or about July 1, 1985 and the action was filed July 1, 1986. The filing of the action tolled the statute of limitations. *United States v. Wahl,* 583 F.2d 285, 287 (6th Cir.1978). The manner in which an action is commenced, and when it is deemed to have commenced is governed by the law of the forum. *Mohler v. Miller,* 235 F.2d 153, 155 (6th Cir.1956). Federal Courts look to F.R. Civ.P. 3 and 4 to determine when an action is commenced. *Smith v. Peters,* 482 F.2d 799 (6th Cir.1973), *cert denied,* 415 U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 886 (1974). Rule 3 requires that a plaintiff do no more to commence an action in federal court than file the complaint. Unlike many state rules of civil procedure, the Federal Rules establish no time period within which service of process must be completed in order to toll the period of limitations. *Wahl,* 583 F.2d at 287. Although the third party plaintiff was cutting it close, the complaint was filed within one year of the alleged tortious activity and was therefore within the limitations period.

### IV. Abuse of Process

■■■■ The "essence" of an abuse of process claim is "the perversion of legal proceedings properly set in motion to a purpose which was not intended." *Blue Goose Growers, Inc. v. Yuma Groves, Inc.,* 641 F.2d 695 (9th Cir.1981). To demonstrate an abuse of process, it must be shown that there was an "ulterior purpose" and a "willful act" in the use of the process not proper in the regular conduct of the proceeding. *Id.* There must be some definite act or threat not authorized by the process or aimed at an objective not legitimate in the use of the process. *Id.* "[N]o liability can attach where the proceeding party has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.*

■■■■ In the present action, the possibility exists that the plaintiffs commenced the action with bad intentions but there is no evidence to suggest that they have attempted to achieve an objective not intended by the civil RICO provisions. They have alleged that their business was damaged by the alleged activities of the defendants. Recovery for such damage is the intended purpose of RICO. *United States v. Forsythe,* 560 F.2d 1127, 1135 (3rd Cir.1977). Thus, there are no grounds for an abuse of process claim and the motion to dismiss such claim is granted.

### V. Damages

The third party defendants have alleged that the complaint filed against them fails to adequately allege cognizable damages. Although the claims against the third party and counterclaim defendants have been dismissed on alternate grounds, the Court feels that it should comment upon the damage argument presented.

■■■■ RICO damages are limited to "injury to business and property"; personal injury damages are excluded. *Drake v. B.F. Goodrich Company,* 782 F.2d 638, 644 (6th Cir.1986). There is no question but that the plaintiffs in the original action have sufficiently alleged RICO damages since they have claimed that the defendant's activities caused them to cease business operations for a period of time. They also allege arson and other damage to business property. The majority of the defendant/third party plaintiffs' damage claims were related to the preempted labor action and could not be considered for pur-

poses of the RICO action. However, among the remaining allegations were claims of damage to union property, such as an arson claim. Such claims would satisfy the damage requirements of RICO. Thus, the action would not have been dismissed for a failure to allege cognizable damages.

Accordingly,

IT IS THEREFORE ORDERED AND ADJUDGED:

(1) that the defendants' motions to dismiss or, in the alternative, for summary judgment due to NLRA preemption are OVERRULED:

(2) that the defendants' motions to dismiss or, in the alternative, for summary judgment for failure to sufficiently allege "racketeering activity" are OVERRULED;

(3) that the defendants' motions to dismiss or, in the alternative, for summary judgment for failure to sufficiently allege a RICO "pattern" are OVERRULED;

(4) that the defendants' motions to dismiss or, in the alternative, for summary judgment for failure to sufficiently allege a RICO "enterprise" are OVERRULED.

(5) that the plaintiff/third party defendants' motions to dismiss or, in the alternative, for summary judgment due to NLRA preemption are SUSTAINED in part and OVERRULED in part;

(6) that the plaintiff/third party defendants' motions to dismiss or, in the alternative, for summary judgment for failure to sufficiently allege a RICO "pattern" are SUSTAINED;

(7) that the third party defendants' motion to dismiss the pendant tort claim of Judy Mullins for failure to commence proceedings within the limitations period is OVERRULED;

(8) that the third party defendants' motion to dismiss an abuse of process claim is SUSTAINED.